[No. B177005. Second Dist., Div. Two. Oct. 4, 2006.]

CARY MEDILL et al., Plaintiffs and Appellants, v.
WESTPORT INSURANCE CORPORATION, Defendant and Respondent.

[No. B182442. Second Dist., Div. Two. Oct. 4, 2006.]

WESTPORT INSURANCE CORPORATION, Cross-complainant,
Cross-defendant and Respondent, v.
STEPHEN P. GOODMAN, Cross-defendant, Cross-complainant and
Appellant;
DAVID SINOW et al., Cross-defendants and Appellants.

COUNSEL

Law Offices of Marlene Greenly and Marlene Greenly for Plaintiff and Appellant Cary Medill.

Jeffrey D. Diamond for Cross-defendant, Cross-complainant and Appellant.

Law Offices of Brian Barry, Brian Barry, Jill Levine; Glancy Binkow & Goldberg, Peter A. Binkow, Daniel Hargis and Marc L. Godino for Cross-defendants and Appellants Heritage Bond Class Action Plaintiffs.

Ross, Dixon & Bell, Jennifer Mathis, Daniel C. Streeter; Thompson, Loss & Judge and Lewis K. Loss for Defendant and Respondent and for Cross-complainant, Cross-defendant and Respondent.

## OPINION

**DOI TODD, Acting P. J.**—Appellants, former directors and officers of a nonprofit organization, seek coverage under a liability insurance policy for claims of negligence and breach of fiduciary duty asserted against them in litigation which arose after the organization and its related entities defaulted on their contractual payment obligations on a series of municipal bonds. The bondholders and the trustee for the bonds sued the directors and officers individually. The insurer denied coverage on three grounds: The policy's definition of "loss" excludes coverage for claims arising out of breach of contract; the policy excludes coverage for claims arising out of the issuance or endorsement of bonds; and the policy excludes coverage for claims arising out of the failure to pay on financial instruments. Summary judgment was granted in favor of the insurer. We agree there is no duty to defend appellants under the policy and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties and Relevant Nonparties

Heritage Housing Development, Inc. (Heritage), is a nonprofit organization and the parent company of various nonprofit entities (Heritage entities). Heritage raised money through municipal bond offerings for the purpose of financing the acquisition, operation and renovation of healthcare facilities for elderly and Alzheimer's patients. Under Securities and Exchange Commission rule 131, the bonds were structured as "conduit financing" in which the obligations of the municipal issuers were assigned to the Heritage entities pursuant to indentures or loan agreements. A new Heritage entity was formed in connection with each bond offering and was considered a "private issuer" under Securities and Exchange Commission rule 131. U.S. Trust Company of Texas, N.A. (U.S. Trust), was the named trustee for the proceeds of the bonds.

Appellant Cary Medill became a director of Heritage in 1997 and appellant Stephen P. Goodman was the chief financial officer of Heritage from November 1998 through August 1999. Appellants who classify themselves as the "Heritage Bond Class Action Plaintiffs" were substituted in as judgment creditors for Virgil Lim, who was an officer of Heritage. Respondent Westport Insurance Corporation (Westport) insured Heritage, the Heritage entities and the directors and officers, as discussed more fully below.

### The Underlying Bond Litigation

The underlying litigation consists of consolidated actions against appellants and other defendants known as *In re Heritage Bonds Litigation* ((J.P.M.L. 2002) 217 F.Supp.2d 1369). The relevant lawsuits are referred to by the parties as the Class Action, brought by a class of bondholders, and the U.S. Trust petition, brought by U.S. Trust.

#### The Class Action

The third amended complaint[1] in the Class Action alleges: "This action arises from damages sustained by Plaintiffs in eleven (11) municipal bond offerings, which raised over $130,000,000 between December 1996 and March 1999. The monies raised were to be used to acquire, renovate and

---

[1] Westport's initial motion for summary judgment cited to the third amended complaint. The fourth amended complaint was filed after summary judgment was granted in Westport's favor and is the complaint cited by Westport in its subsequent motion for summary adjudication. Both of these lengthy complaints are briefly discussed here. There are no substantive differences between the two complaints that would alter our coverage analysis.

reopen former hospitals in Texas, Florida, Illinois and California, as Facilities designed to assist elderly persons . . . . However, due to wrongful disbursements, diversions of bond proceeds and improper co-mingling of funds, renovations at many of the Facilities were not completed. All of the Facilities went into receivership-foreclosure shortly after the bond offerings."

The complaint further alleges that under each loan agreement between the municipal issuer and the Heritage entity as the private issuer, the Heritage entity was solely obligated to repay all principal, interest and any premium on the bonds, but defaulted on the bond repayment obligations, rendering the bonds virtually worthless. The class plaintiffs further allege that as part of an elaborate "Ponzi" scheme, proceeds from subsequent bond offerings were used to cover the cash shortfalls from prior bond offerings and that these transfers of money among the various Heritage entities violated the loan agreements and indentures. The questions of law and fact common to the members of the class were alleged to include whether the defendants violated federal and state securities laws; breached their fiduciary duties to the class; were negligent in performing their obligations and responsibilities owed to the class; made material misrepresentations in the course of the bond offerings; and breached their contracts with the class.

The third amended complaint asserts causes of action against appellant Goodman and Virgil Lim for violations of the Securities Exchange Act of 1934 (15 U.S.C. § 78a et seq.) and Corporations Code section 25504, and causes of action against all Heritage director and officer defendants for negligence and breach of fiduciary duties. The negligence claim alleges that "Defendants breached their duties owed to Plaintiffs and the Class by failing to adequately perform all appropriate investigations and analysis required to determine the legitimacy and feasibility of the proposed plans under each of the Bond offerings and/or failing to include the discoverable and known adverse information in the respective Official Statements." With respect to the fiduciary duty claim, the complaint alleges that defendants breached their duty of care to plaintiffs by, among other things, failing to ensure the disclosure of material information in the official statements; failing to file annual reports with the appropriate agencies; permitting the Heritage entities to transfer funds among themselves in violation of the terms of the indentures and loan agreements; and failing to adequately monitor construction and operation of the facilities.

The fourth amended complaint further alleges that the class plaintiffs suffered approximately $100 million in damages, that "Heritage Outside Directors routinely approved matters presented to them without question and failed to perform due diligence," and that Virgil Lim "signed and submitted to U.S. Trust, numerous fund transfer requests . . . which requested transfers

among the various Heritage Entities." The negligence cause of action further alleges that Lim commingled bond funds, engaged in self-dealing and approved future projects after being informed that prior projects were over budget, and that appellant Medill approved future bond offerings rather than correcting the existing problems at the facilities and failed to fire the management companies.

### The U.S. Trust Action

The U.S. Trust petition was filed by U.S. Trust as the indenture trustee against appellants Medill, Goodman and other directors and officers not parties here "to recover damages caused by the negligent acts, omissions and breaches of duty of the various defendants." The petition alleges that "Certain Defaults and Events of Default (as defined in the Indentures and the Deeds of Trust) have occurred under all of the Indentures and all of the Deeds of Trust, including Events of Default for failure to make payments on the Notes and Bonds when due." In the section of the petition entitled "Misfeasance and Malfeasance of the Defendant Directors and Officers," the petition alleges defendants knew or should have known the healthcare projects were not feasible; failed to adopt realistic expectations regarding rates of stabilization, revenues, operating costs, debt and corporate overhead of the facilities; caused the issuance of additional bonds for more projects when prior projects had already failed or were about to fail; improperly used future bond proceeds to pay for costs of earlier projects in violation of the applicable bond documents; and failed to adequately supervise construction and operation of the facilities. Causes of action for breach of fiduciary duties, negligence and fraudulent concealment of "their misfeasance and malfeasance" are asserted against appellants.

### The Policy and Denial of Tender

Westport issued a "Nonprofit Organization Liability Insurance" policy to Heritage and the Heritage entities for the period of February 16, 2000, to February 16, 2001, for which the premium was $14,095. The limit of liability was $5 million for "each loss and aggregate for each Policy Period." In addition to Heritage and the Heritage entities, insureds under the policy include any person "acting within the course and scope of his or her duties and responsibilities on behalf of [Heritage or the Heritage entities], who was, now is, or shall be a director, officer, trustee, employee, volunteer, or staff member."

Under part I, entitled "Coverage," the policy provides: "We will pay on the 'insured's' behalf all 'loss' for which the 'insured' shall be legally obligated to pay resulting from civil 'claims' that are made against the 'insured'

because of a 'wrongful act,' provided that the 'claim' is first made during the 'policy period' and written notice of said 'claim' is received by us no later than sixty (60) days after the expiration date of the 'policy period.' "

Under part III, entitled "Definitions," the policy defines "loss" as "any amount which the 'insured' is legally obligated to pay for any 'claim' or 'claims' made against the 'insured' during the 'policy period' for 'wrongful acts,' and includes compensatory damages, prejudgment interest, judgments and settlements. 'Loss' shall not include any of the following: [¶] . . . [¶] 5. Damages 'arising out of' breach of any contract, whether oral, written or implied, except employment contracts with individuals." "Arising out of" is defined as "based upon, arising out of, or in connection with." The policy defines "Wrongful act(s)" as "any actual or alleged error or omission, negligent act, misleading statement, or breach of duty committed by an 'insured' in the performance of duties on behalf of the 'entity.' "

Under part IV, entitled "Exclusions," the policy contains two exclusions relevant here. First, the policy provides that it "does not apply to any 'claim,' or 'loss' alleging or 'arising out of' [¶] . . . [¶] I. 1. Violation of the Securities Act of 1933 as amended or the Securities Exchange Act of 1934 as [a]mended or any state blue sky or securities law or similar state or federal statute and any order or regulation issued pursuant to any of the foregoing statutes, or any 'insured's' issuance or endorsement of stocks, bonds, securities, annuities, or other financial instruments. Second, the policy does not apply to any 'claim,' or 'loss' alleging or 'arising out of' . . . [¶] I. 2. Failure to honor or pay on any financial instrument or credit given for continued patronage or use of any 'insured's' services or products."

Appellant Medill and other Heritage directors tendered defense of the underlying bond litigation to Westport. Relying on the above cited provisions, Westport denied coverage.

*Trial Court Proceedings*

Appellant Medill and other directors sued Westport for breach of contract, breach of the implied covenant of good faith and fair dealing and declaratory relief, alleging that Westport had wrongfully refused to provide a defense in the underlying bond litigation.[2] Westport moved for summary judgment, arguing that it had no duty to defend because the policy's definition of "loss" did not include coverage for claims arising out of breach of contract, and the policy specifically excluded coverage for claims arising out of the issuance or endorsement of bonds and the failure to pay on the bonds.

---

[2] Westport thereafter agreed to provide a defense subject to a reservation of rights pending a determination by the court whether it had a duty to defend.

The trial court granted the motion, finding that the three policy provisions relied on by Westport precluded the duty to defend. First, the court noted the policy definition of "loss" excludes coverage for damages arising out of breach of contract. The court explained that "[a]lthough the plaintiffs in the Bond Litigation seek recovery on the basis of numerous legal theories, all of the claims alleged against Heritage's directors and officers are premised on breach of its contractual obligations in connection with the bond transactions. [¶] . . . [¶] . . . Without the alleged breaches of various agreements as cited in the Bond Litigation, there could be no recovery against the directors and officers for mismanagement, breach of fiduciary duty or negligence." Second, the court found that the policy exclusion for claims or loss arising out of any insured's issuance or endorsement of bonds was applicable because "the complaints allege that the insureds made numerous misrepresentations when offering and promoting the bonds for sale" and "there is no coverage where any insured engaged in the excluded activity and where the claims against [the insureds] arise out of that activity." Third, the court found that the policy exclusion for claims or loss arising out of the failure to pay on any financial instrument was also applicable because "[i]t is undisputed that the Bond Litigation is premised on Heritage's default on its financial obligations under the bonds and related financial instruments" and "[t]he allegations against Heritage's directors and officers are directly related to Heritage's failure to pay." The court therefore concluded that Westport had "conclusively established that there is no potential for coverage for any of the claims asserted against [the insureds]." Appellant Medill appeals from the summary judgment in favor of Westport.

Following the court's order granting summary judgment, Westport filed a cross-complaint against other insureds who claimed Westport had a duty to defend them in the underlying bond litigation, including appellant Goodman and Virgil Lim. Summary adjudication was ultimately granted to Westport on the duty to defend based on the same analysis. Appellants Goodman and the Heritage Bond Class Action Plaintiffs, who have taken Lim's place, separately appeal from this summary adjudication in favor of Westport. The appeals have been consolidated.

## DISCUSSION

### I. *Standard of Review*

" 'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo.' [Citations.] If, in deciding this appeal, we find there is no issue of material fact, we affirm the summary judgment if it is correct on any

legal ground applicable to this case, whether that ground was the legal theory adopted by the trial court or not, and whether it was raised by defendant in the trial court or first addressed on appeal. [Citation.] If, on the other hand, we find that one or more triable issues of material fact exist, then we must reverse the judgment." (*Westoil Terminals Co., Inc. v. Industrial Indemnity Co.* (2003) 110 Cal.App.4th 139, 145 [1 Cal.Rptr.3d 516].) Similarly, we apply the de novo standard of review to the interpretation of an insurance policy. (*Ibid.*; *E.M.M.I., Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385].)

## II. *The Duty to Defend*

█ It is well established that an insurer must defend its insured against a suit "which *potentially* seeks damages within the coverage of the policy." (*Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275 [54 Cal.Rptr. 104, 419 P.2d 168].) This obligation can only be excused when the third party complaint " '*can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) "In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*." (*Ibid.*) Any doubt as to whether the facts give rise to a duty to defend is resolved in the insured's favor. (*Id.* at pp. 299–300.)

"However, while the duty to defend is broad, it is not unlimited. It is entirely dependent upon a showing by the insured that the third party claim for which it seeks a defense is one for damages which *potentially* fall within the policy coverage. It is the nature and kind of risk covered by the policy which both defines and limits the duty to defend." (*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 556 [59 Cal.Rptr.2d 36]; see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

█ "[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy." (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 19.) "If, at the time of tender, the allegations of the complaint together with extrinsic facts available to the insurer demonstrate no potential for coverage, the carrier may properly deny a defense." (*We Do Graphics, Inc. v. Mercury Casualty Co.* (2004) 124 Cal.App.4th 131, 136 [21 Cal.Rptr.3d 9].)

### III. *Three Policy Provisions Preclude the Duty to Defend*

#### A. *Arising out of Breach of Contract*

 We first consider whether Westport owed a duty to defend the directors and officers in the underlying bond litigation under the insuring language and definitions of the liability policy. "Before 'even considering exclusions, a court must examine the coverage provisions to determine whether a claim falls within [the policy terms].' " (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 16.) " '[A]lthough exclusions are construed narrowly and must be proven by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage, and (unlike exclusions) courts will not indulge in a forced construction of the policy's insuring clause to bring a claim within the policy's coverage.' " (*Ibid.*) Accordingly, appellants have the initial burden of proving the claim falls within the scope of coverage. (*Prichard v. Liberty Mutual Ins. Co.* (2000) 84 Cal.App.4th 890, 910 [101 Cal.Rptr.2d 298].)

The policy restricts coverage to "loss," which is defined as "any amount which the 'insured' is legally obligated to pay for any 'claim' or 'claims' made against the 'insured' during the 'policy period' for 'wrongful acts' . . . ." The definition of "loss" then provides that "loss" shall not include "Damages 'arising out of' breach of any contract, whether oral, written or implied, except employment contracts with individuals."

Appellants contend that the breach of contract exclusion in the policy's definition of "loss" does not apply because none of the plaintiffs in the bond litigation asserted any claims for breach of contract against appellants or alleged any privity of contract between plaintiffs and appellants or that appellants were personally liable for any other party's failure to pay on the bonds. Appellants argue that plaintiffs asserted only tort claims against the directors and officers for negligence and breach of fiduciary duty, which are specifically included in the policy's definition of "wrongful act(s)." We are not persuaded by this argument.

In essence, the plaintiffs in the underlying bond litigation are seeking to recover damages for the failure of the Heritage entities to perform their contractual obligations to make repayments on the bonds. Plaintiffs allege that these defaults were caused in part by the improper transfer of money among the various Heritage entities in violation of the terms of the loan agreements and indentures, and by the wrongful conduct of the directors and officers in connection with the issuance of the bonds and mismanagement of the bond funds and bond-funded projects. In other words, the bond litigation in its entirety "arises out of" breach of contract.

The policy broadly defines "arising out of" as "based upon, arising out of, or in connection with." Case law similarly grants a broad definition to the phrase "arising out of." "California courts have consistently given a broad interpretation to the terms 'arising out of' or 'arising from' in various kinds of insurance provisions. It is settled that this language does not import any particular standard of causation or theory of liability into an insurance policy. Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship." (*Acceptance Ins. Co. v. Syufy Enterprises* (1999) 69 Cal.App.4th 321, 328 [81 Cal.Rptr.2d 557].) "Such language 'requires [the court] to examine the conduct underlying the . . . lawsuit, instead of the legal theories attached to the conduct.' " (*Century Transit Systems, Inc. v. American Empire Surplus Lines Ins. Co.* (1996) 42 Cal.App.4th 121, 127, fn. 4 [49 Cal.Rptr.2d 567].)

*Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.* (2003) 106 Cal.App.4th 293 [130 Cal.Rptr.2d 728] is instructive. There, Southgate Recreation and Park District contracted with a general contractor to build a golf course. The general contractor went bankrupt and unpaid subcontractors sued Southgate and its directors seeking payment for goods and services they had provided. (*Id.* at pp. 296–297.) Southgate sought defense and indemnity under insuring documents that excluded from coverage any liability "[a]rising out of or related to construction . . . contracts or to any other contract for the purchase of goods or services." (*Id.* at p. 301.) Southgate argued that the subcontractors' claims were noncontractual and that the contract exclusion was inapplicable because the claims were based on negligent administration of the construction contract funds. (*Ibid.*) The reviewing court disagreed: "Southgate's alleged negligence and breach of statutory duties arise out of or are related to the . . . construction contract. It is Southgate's failure to retain funds under that very contract and Southgate's failure to ensure an adequate payment bond for that very contract that comprise the basis of the subcontractor lawsuits against Southgate for conversion, breach of trust, and violation of stop notice. The construction contract exclusion applies. This linkage between the . . . construction contract and Southgate's alleged failings regarding the subcontractors, coupled with the 'arising out of' language of the construction contract exclusion, defeats Southgate's argument that this exclusion applies only if there were direct construction contracts between Southgate and the subcontractors." (*Id.* at p. 302.)

Similarly here, the directors' and officers' potential liability would not exist without the contracts Heritage and the Heritage entities entered into in connection with the issuance and financing of the bonds. All of the allegations against the directors and officers arise out of duties and obligations Heritage and the Heritage entities assumed under the bond contracts. The claims are therefore not within the scope of coverage.

The class appellants assert that the breach of contract exclusion is ambiguous because it operates to preclude coverage for a claim denominated as "negligence" when the policy expressly provides coverage for "negligence" under the definition of "wrongful act(s)." They rely on a federal case, *Church Mutual Ins. Co. v. U.S. Liability Ins. Co.* (S.D.Cal. 2004) 347 F.Supp.2d 880, which we find to be inapposite. There, an insured was sued for breach of a construction contract and fraud. The liability policy excluded coverage for any claim " 'arising out of, directly or indirectly resulting from or in consequence of, or in any way involving . . . any actual or alleged breach of contract.' " (*Id.* at p. 884.) The insurer argued that pursuant to this language, no more than an incidental connection between breach of contract and fraud was required. (*Ibid.*) The court rejected this argument, finding that the exclusionary language was ambiguous when read in conjunction with the coverage provisions providing coverage for "wrongful acts," defined to include fraudulent statements. (*Id.* at p. 886.) The court concluded that the ambiguous exclusionary language should be narrowly construed against the insurer to require more than an incidental connection. (*Ibid.*) The court then determined that the gravamen of the underlying complaint was fraud, not breach of contract: "Based on the complaint, [insured's] failure to perform the contract arises out of its fraudulent intent. [Insurer] contends that the [underlying action] would not have been brought against [insured] but for [insured's] failure to pay for [plaintiff's] work. This interpretation of [the underlying] complaint is belied by the allegations that [insured] defrauded [plaintiff] into reducing its billing statements by falsely claiming that [plaintiff's] work was unsatisfactory, and that [insured] stole the core of [plaintiff's] business. These allegations are independent of breach of contract." (*Id.* at p. 889.)

■ Here, the tort claims against the directors and officers are not independent of the breach of contract claims. No aspect of the underlying bond litigation would exist without the alleged breaches of the loan agreements and indentures and the contractual obligations to pay on the bonds. Without the breaches of the contractual obligations to make repayments on the bonds, there would have been no loss to the bondholders and no recovery against the directors and officers for mismanagement, negligence or breach of fiduciary duty. "Language in an insurance policy is 'interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract.' [Citation.] 'The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances *of this* case. [Citation.] "The provision will shift between clarity and ambiguity with changes in the event at hand." [Citation.]' " (*E.M.M.I., Inc. v. Zurich American Ins. Co.*, *supra*, 32 Cal.4th at p. 470.) Under the circumstances here, we do not find the breach of contract exclusionary language to be ambiguous.

Appellants have failed to meet their burden of proving there has been a covered claim within the terms of the policy. But even if they had met their burden, the policy's exclusions would still preclude coverage, as discussed below.

### B. *Issuance or Endorsement of Bonds*

As noted above, under the section entitled "Exclusions," the policy "does not apply to any 'claim,' or 'loss' alleging or 'arising out of' [¶] . . . [¶] I. 1. Violation of the Securities Act of 1933 as [a]mended or the Securities Exchange Act of 1934 as amended or any state blue sky or securities law or similar state or federal statute and any order or regulation issued pursuant to any of the foregoing statutes, *or any 'insured's' issuance or endorsement of stocks, bonds, securities, annuities, or other financial instruments.*" (Italics added.)

■ Appellants claim this exclusion is inapplicable because there are no allegations in the underlying bond litigation that any of the individual directors and officers issued any bonds. We find this fact to be irrelevant. As Westport notes, there is no coverage under the policy where *any* insured engaged in the excluded activity (i.e., the bond issuances) and where the claims against the directors and officers arise out of that activity. California cases have determined that the phrases "any insured" or "an insured" unambiguously preclude coverage to all persons covered by the policy if any one of them engages in excludable conduct. (See, e.g., *Fire Ins. Exchange v. Altieri* (1991) 235 Cal.App.3d 1352, 1361 [1 Cal.Rptr.2d 360] [finding a homeowner's policy provided no coverage to parents whose son injured a schoolmate in a fight]; *Western Mutual Ins. Co. v. Yamamoto* (1994) 29 Cal.App.4th 1474, 1486–1487 [35 Cal.Rptr.2d 698] [same]; *California Casualty Ins. Co. v. Northland Ins. Co.* (1996) 48 Cal.App.4th 1682, 1697–1698 [56 Cal.Rptr.2d 434] [finding no coverage for wife whose husband engaged in excluded activity].) Thus, we must determine whether "any insured" engaged in the excluded activity of issuing the bonds.

Although municipal entities were the public issuers of the bonds in the first instance, the plaintiffs in the underlying bond litigation allege that through a conduit financing arrangement under Securities and Exchange Commission rule 131, the Heritage entities became the private issuers of the bonds and the obligations of the municipalities were transferred to the Heritage entities through indentures or loan agreements. Pursuant to rule 131, the bonds and notes evidencing the Heritage entities' indebtedness are considered "securities," and the Heritage entities, as obligors, are considered to be the issuers of these securities. (17 C.F.R. § 230.131 (2006).) Thus, the Heritage entities, as insureds, engaged in the excluded activity of issuing bonds or securities.

Furthermore, both the Heritage entities and appellants are alleged to have "endorsed" the bonds and related financial instruments that evidenced the Heritage entities' contractual obligations to make payments on the bonds. For example, U.S. Trust alleges that the Heritage entities executed promissory notes and entered into loan and security agreements in connection with each of the bond-funded projects. U.S. Trust also alleges that the directors and officers caused bonds to be issued based on misleading statements regarding the use of the bond proceeds. Plaintiffs in the class action allege that the Heritage entities breached loan and security agreements that obligated them to repay the bonds. The class plaintiffs further allege that the directors and officers "endorsed" the bonds and related financial instruments by promoting investments without making material disclosure of adverse information in the official statements for each bond offering. Such endorsement is also an excluded activity. Accordingly, the trial courts did not err in finding that the bond exclusion applied and precluded coverage for the claims against appellants.

### C. *Failure to Pay on Financial Instruments*

The second policy exclusion relevant here provides that the policy "does not apply to any 'claim,' or 'loss' alleging or 'arising out of' [¶] . . . [¶] Failure to honor or pay on any financial instrument or credit given for continued patronage or use of any 'insured's' services or products."

Appellants contend that this exclusion is inapplicable because there are no allegations in the underlying bond litigation against the individual directors and officers for failure to pay any debt. But the policy excludes claims or loss "arising out of" the failure to honor or pay any financial instrument or credit. The exclusion does not require that the obligation to pay be connected to any personal obligation of the individual director or officer seeking coverage. Rather, the exclusion bars coverage in its entirety for any claim arising out of the failure to make payments. Plaintiffs allege that they were damaged and lost their investments in the bonds because the Heritage entities defaulted on their contractual bond repayment obligations, rendering the bonds virtually worthless. The bond litigation clearly arises out of this failure to pay on the bonds and related instruments.

The class appellants also argue that the "failure to pay" exclusion is inapplicable because it is "hopelessly vague and ambiguous" and must therefore be construed against the insurer. Focusing on the following italicized language of the provision ("Failure to honor or pay on any financial instrument or credit *given for continued patronage or use of any 'insured's' services or products*"), they assert that the language is unclear whether it relates only to the term "credit," or whether it also relates to the term

"financial instrument." They point out that no evidence was introduced below to help interpret this phrase. According to the class appellants, the more reasonable interpretation is that the provision is not meant to apply to the Heritage bonds because it would have been a simple matter for the policy to plainly and clearly exclude obligations to make payments on the bonds when Westport must have been aware that the health care facilities were funded by municipal bonds. The class appellants argue that the provision must only apply to customers of Heritage, and none of the plaintiffs were customers.

■ " 'A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable.' [Citations.] The fact that a term is not defined in the policies does not make it ambiguous. [Citations.] Nor does '[d]isagreement concerning the meaning of a phrase,' or ' "the fact that a word or phrase isolated from its context is susceptible of more than one meaning." ' [Citation.] ' "[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." ' [Citation.] 'If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage.' [Citation.]" (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 868 [77 Cal.Rptr.2d 107, 959 P.2d 265].)

We tend to agree with the class appellants that, when isolated from its context, the italicized language is ambiguous because it is unclear whether it applies to the term "financial instrument." But construing the phrase in the context of the policy as a whole, we find no ambiguity. There is nothing in the policy to suggest that Westport was undertaking to guarantee the insureds' substantial financial obligations, whether they be obligations to pay on financial instruments or credit. It simply does not appear that such voluntarily assumed financial obligations are intended to be insured under the policy. But even if we were inclined to find that the exclusion was ambiguous and should be construed against the insurer, we have already concluded that there is no coverage for the claims against appellants under the insuring agreement provisions and the bond issuance exclusion.

## IV. *No Concurrent Independent Cause of Loss Supports Coverage*

Relying on *State Farm Mut. Auto. Ins. Co. v. Partridge* (1973) 10 Cal.3d 94, 97 [109 Cal.Rptr. 811, 514 P.2d 123] (*Partridge*), the class appellants argue that an insurer has a duty to defend an insured under a third party liability policy if a covered risk is a proximate cause of the injury, even if an excluded risk is also a concurrent or joint cause of the injury. But we have already

concluded, *ante*, that appellants have failed to establish a covered risk within the terms of the policy, finding that all of the asserted claims against the directors and officers arise out of breach of contract, which is specifically excluded from the policy's definition of "loss." Even if we were to find otherwise, *Partridge* has no application here.

In *Partridge*, the insured was hunting from his car using a gun he had modified to create a "hair trigger" action. After the insured drove the car off road, the car hit a bump and the gun fired, hitting and paralyzing a passenger, who sued the insured. (*Partridge, supra*, 10 Cal.3d at pp. 97–98.) The insured's homeowner's liability policy covered liability resulting from the gun modification, but not injuries arising out of the use of a motor vehicle. The Supreme Court concluded that where two independent risks jointly caused the injury, the insurer is liable so long as one of the risks is covered by the policy. (*Id.* at pp. 102–103.) The court found that "although the accident occurred in a vehicle, the insured's negligent modification of the gun suffices, in itself, to render him fully liable for the resulting injuries. . . . [I]nasmuch as the liability of the insured arises from his non-auto-related conduct, and exists independently of any 'use' of his car, we believe the homeowner's policy covers that liability." (*Id.* at p. 103.) Courts following *Partridge* have made it clear that its holding only applies to "multiple causes that operated totally independently of one another." (*Conestoga Services v. Executive Risk Indemnity* (9th Cir. 2002) 312 F.3d 976, 983; see also *State Farm Fire & Cas. Co. v. Kohl* (1982) 131 Cal.App.3d 1031, 1039 [182 Cal.Rptr. 720] ["The injury there, as here, resulted directly from an independent negligent act"]; *Underwriters Ins. Co. v. Purdie* (1983) 145 Cal.App.3d 57, 68 [193 Cal.Rptr. 248] ["The [*Partridge*] court reasoned that when two, independent, negligent acts concur to produce one injury, each act should be viewed separately to determine policy coverage"].)

Here, the alleged negligence and breach of fiduciary duties by the directors and officers did not exist independently of the other risks not covered by the policy. To the contrary, such alleged misconduct "arises out of" and is directly connected to the excluded risks for issuance or endorsement of the bonds and failure to pay on the bonds, as discussed above. The only way the class appellants could have been exposed to the risk of the alleged negligence of the officers and directors was by virtue of the bonds being issued in the first place, a risk specifically not covered by the policy. As Westport notes, in order to invoke *Partridge*, the class appellants would have to show that the loss they suffered (i.e., loss of their investment and ability to earn a profit) would have occurred without the Heritage entities' breaches of contract, defaults on their bond obligations or the issuance of the bonds in the first place. But none of the negligent acts or breaches of duty by the officers and directors were independent of the excluded risks not covered. Thus, the concurrent proximate cause analysis in *Partridge* has no application here.

## V. *The Policy's Coverage is Not Illusory*[3]

Finally, appellants argue that if there is no coverage under the policy for negligence, coverage under the policy is illusory and the policy constitutes an illegal contract. Appellant Medill argues that under Westport's interpretation of the policy, "no director of a company would ever be entitled to a defense in an action in which he/she was sued for breach of fiduciary duty so long as such company had issued securities in the past." We disagree. The business of Heritage and the Heritage entities was operating health care facilities, not issuing bonds. Thus, not every lawsuit that could conceivably be brought against the directors and officers of Heritage and the Heritage entities would necessarily arise out of those entities' issuance of bonds, failure to pay on those bonds, or breaches of contract in connection with those bonds. For example, the policy specifically covers claims involving wrongful employment practices.

" 'It is common to hear the argument that if the underlying complaint alleges negligence, there must be a duty to defend. This is not necessarily true. The duty to defend depends upon the coverage provided by the policy—the "nature and kind of risk covered"—which in turn depends upon the wording of the coverage clauses. . . .' " (*Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 610 [135 Cal.Rptr.2d 131].) As the court stated in *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins., supra*, 106 Cal.App.4th at pages 302–303: "In the end, we agree with the following comment from the trial court: 'Interpreting [the two] Memoranda as a whole, it is clear that the self-insurance pool members did not intend, under any reasonable interpretation, to act as a guarantor for unpaid contractual obligations for labor, materials and/or equipment provided to the Wildhawk construction project.' " The same is true here. There is nothing in the policy to suggest that Westport intended to act as a guarantor for hundreds of millions of dollars of unpaid contractual obligations in connection with issuance of the bonds.

[3] In his reply brief, appellant Goodman relies upon an unpublished opinion from the district of Minnesota, *Leonard v. Executive Risk Indemnity, Inc. (In re SRC Holdings Corp.)* (D.Minn. Sept. 13, 2005, Civ. 05-00659). Westport urges us not to consider this authority, and we will not do so. Points raised for the first time in a reply brief will generally not be considered. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Likewise, "[w]e need not consider an argument not mentioned in the briefs and raised for the first time at oral argument. [Citation.]" (*Ace American Ins. Co. v. Walker* (2004) 121 Cal.App.4th 1017, 1027, fn. 2 [18 Cal.Rptr.3d 1].) Thus, we need not address the brief statement made for the first time at oral argument by counsel for class appellants, without citation to the record, that one of the parties not appearing on appeal opposed the motion for summary judgment under Code of Civil Procedure section 437c, subdivision (h), on the ground that Westport had not appeared at its deposition to offer examples of claims that would be covered under the policy.

## DISPOSITION

The judgments are affirmed. Westport is entitled to its costs on appeal.

Ashmann-Gerst, J., and Chavez, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied December 20, 2006, S148000.