Filed 6/21/24  Practice Fusion v. Freedom Specialty Ins. Co. CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PRACTICE FUSION, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> FREEDOM SPECIALTY INSURANCE COMPANY et al., <br><br> Defendants and Respondents. | A167130, A167886 <br><br> (San Francisco County Super. Ct. No. CGC20588161) |

This appeal concerns the applicability of professional services coverage exclusions in directors and officers liability insurance policies. The policies here were issued to Practice Fusion, Inc., a company that develops and licenses electronic health record software for use by healthcare providers. Following investigations by the United States Department of Justice, Practice Fusion entered into a civil settlement with the United States that resolved two distinct sets of claims, one of which (at issue here) alleged that Practice Fusion violated the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b) by taking money from pharmaceutical manufacturers in exchange for Practice Fusion deploying "Clinical Decision Support alerts" in its software that were intended to increase sales of the companies' products. Under federal regulations, Clinical Decision Support alerts are intended to provide the users of electronic health record software with evidence-based

1

information to support patient care.  But the Department of Justice alleged that Practice Fusion allowed pharmaceutical manufacturers to participate in designing the alerts, and that the alerts did not always reflect accepted medical standards.  Further, although the alerts appeared to healthcare providers as unbiased medical information, it was alleged that in some instances they were designed to encourage healthcare providers to prescribe a specific product or class of products to the benefit of the sponsoring pharmaceutical company.  When Practice Fusion sought insurance coverage for the civil settlement under its directors and officers liability insurance policies, its insurers denied coverage as to both sets of claims on the ground that the policies' professional services exclusions applied to the losses. Practice Fusion then sued the insurers for breach of contract.

The trial court granted the insurers' motion for summary adjudication of Practice Fusion's cause of action pertaining to the Clinical Decision Support alerts.  The trial court concluded that the claims concerning the Clinical Decision Support alerts arose from Practice Fusion providing professional services to the pharmaceutical companies by designing and implementing the alerts under its contracts with those companies, and that coverage for the claims is thus barred by the professional services exclusion in the policies.  Practice Fusion now appeals from the resulting judgments, and we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Background on Electronic Health Records*

An electronic health record is an electronic version of a patient's medical history as maintained by a healthcare provider.  It typically includes information relevant to patient care, including demographics, vital signs, medications, past medical history, immunizations, and laboratory reports.  To

2

encourage healthcare providers to use electronic health record technology, the Centers for Medicare and Medicaid services established an incentive program (the "meaningful use incentive program") that allowed healthcare providers to apply for payments if they "meaningfully use" certified electronic health record technology in delivering care to Medicare and Medicaid beneficiaries. The technology must meet certain standards to qualify as "certified."

Certified electronic health record technology must provide "clinical decision support" (CDS) interventions, which may be in the form of alerts, notifications, or explicit care suggestions. (See 45 C.F.R. § 170.314(a)(8) (2012) [setting forth criteria for electronic health record certification with respect to clinical decision support].) CDS has been described as "functionality that builds upon the foundation of an [electronic health record] to provide persons involved in care processes with general and person-specific information, intelligently filtered and organized, at appropriate times, to enhance health and health care." (75 Fed. Reg. 44314, 44350 (July 28, 2010).) A CDS alert might be a visual prompt on a healthcare provider's computer screen that displays potential treatments or care options based on a patient's medical data.

Federal regulations require that certified electronic health record technology must "electronically identify" the "diagnostic and therapeutic reference information" supporting the intervention. (45 C.F.R. § 170.314(a)(8)(ii); 77 Fed. Reg. 54163, 54215 (Sept. 4, 2012).) The technology must also allow the user to identify the source of the funding for the work performed by the person, organization or entity that interpreted the clinical research supporting the intervention and translated it into computable form. (45 C.F.R. § 170.314(a)(8)(v)(A)(2)-(3); 77 Fed. Reg. 54163, 54215 [funding

3

source may be the developer of the electronic health record technology, or may be a third party such as a government agency, insurance carrier, or "biomedical product developer"].)

B.    *Background on Practice Fusion*[1]

Practice Fusion develops cloud-based electronic health record software, and since 2007 it has licensed versions of the software to healthcare providers.  The software allows patients to book appointments with healthcare providers; providers to chart patient visits, write prescriptions, order lab work and imaging, and make referrals; labs, pharmacies and providers to receive orders and referrals; and patients and providers to access health records.

Practice Fusion obtained certifications for several versions of its electronic health record software, which meant that the software qualified as a certified electronic health record technology under the federal government's meaningful use incentive program.

During the relevant time period, Practice Fusion licensed and provided access to its software for free.  It made money by placing advertisements in its software, by licensing and analyzing data for pharmaceutical companies and other third parties, and by allowing pharmaceutical companies to pay to sponsor CDS alerts in the software.  Between 2013 and 2017, Practice Fusion contracted with 13 pharmaceutical companies to sponsor CDS alerts.  These contracts would become a focus of an investigation by the United States Department of Justice, which led to the settlement at the center of this appeal.

---

[1] The material facts in this case are largely undisputed, as reflected in the Stipulation of Undisputed Material Facts submitted by the parties to the trial court.

4

Five of these contracts were titled "services agreement." Others were styled as a statement of work under a services agreement; as an order for services under a statement of work; or as a work order to a master services agreement. Still another was a "statement of work for collaboration project," and two others were "statement[s] of work . . . of the CDS Program." Two of the contracts, prepared on Practice Fusion forms, were entitled "collaboration agreement."

Although the contracts differed in form, they all involved Practice Fusion agreeing to modify its electronic health record software by embedding CDS alerts that would be triggered by guidelines that the pharmaceutical companies wanted Practice Fusion to use. Typically, the contracts included attachments specifying the agreed-upon guidelines that would trigger each CDS alert. And typically Practice Fusion agreed to provide the pharmaceutical company, for its internal review and approval, "[v]isual and narrative depictions of" the CDS alerts that would appear on the computer screens of the healthcare providers using Practice Fusion's electronic health record software.

Some of the contracts, including the Practice Fusion form contract, required the parties to form a program or project "team" that included employees of Practice Fusion and the pharmaceutical company "having appropriate technical expertise and experience in disciplines relevant to and necessary to complete" the CDS alert program to be implemented under the contract.[2]

---

[2] The parties' briefs discuss at some length a contract that was prepared on Practice Fusion's form "Collaboration Agreement," treating it as an exemplar. Practice Fusion states that the "scope of work" attachments to the various "service agreements" at issue here "typically used the language of the Collaboration Agreements developed by Practice Fusion."

C.  *The Settlement Between the United States Department of Justice and Practice Fusion*

In January 2020, Practice Fusion agreed to pay $118,642,000 plus interest to the United States and participating states to resolve claims arising from investigations relating to Practice Fusion's electronic health record software. The settlement resolved two sets of claims arising from two separate investigations. In one set of claims, the "meaningful use" claims, the United States Department of Justice (DOJ) alleged that Practice Fusion had misrepresented to the certifying entity that its software met the requirements for a certified electronic health record technology. These claims are not at issue in this appeal. The other set of claims, the "Clinical Decision Support" or CDS claims, gave rise to this appeal.

In the CDS claims, the DOJ alleged that "between November 2013 and August 2017, Practice Fusion solicited and received improper remuneration from certain pharmaceutical manufacturers based on the anticipated financial benefit to the pharmaceutical manufacturers from increased sales of pharmaceutical products that would result from CDS alerts Practice Fusion would deploy within its [electronic health records] software." According to the DOJ, "Practice Fusion permitted pharmaceutical manufacturers that paid Practice Fusion to participate in designing the CDS alert, including selecting the guidelines used to develop the alert, setting the criteria that would determine when a healthcare provider received an alert, and in some cases, even drafting the language used in the alert itself." The DOJ alleged that the "CDS alerts that Practice Fusion agreed to implement did not always reflect accepted medical standards"; that "in at least one case, Practice Fusion's own legal department noted that the guidance was 'not the gold standard'"; and that although the "alerts appeared to healthcare providers as unbiased medical information, . . . the CDS alerts were, in some instances,

6

designed to encourage users to prescribe a specific product or class of products."  "Therefore," the United States alleged, "Practice Fusion knowingly and willfully solicited and received remuneration from pharmaceutical manufacturers in return for arranging for or recommending purchasing or ordering of a good or item for which payment may be made in whole or in part under a Federal health care program in violation of the Anti-Kickback Statute ('AKS'), 42 U.S.C. § 1320a-7b, and . . . the claims for payment that providers submitted, between April 2014 and April 2019 . . . for prescriptions which were tainted by these kickbacks are false claims."[3]

D.    *Practice Fusion's Insurance Coverage*

For the time period relevant to the CDS claims, each of the following insurers issued a primary or excess directors and officers (D&O) liability insurance policy to Practice Fusion:  Hiscox Insurance Company, Inc. (Hiscox); U.S. Specialty Insurance Company (USSIC); Starr Indemnity & Liability Company (Starr); Freedom Specialty Insurance Co. (Freedom); Allied World Assurance Company (US) Inc. (Allied); Certain Underwriters at Lloyd's of London (Lloyd's); RSUI Indemnity Company (RSUI); and Wesco Insurance Company (Wesco).  The policies in this "insurance tower" provided a total of $50 million in coverage.

---

[3] At the same time it entered the settlement, Practice Fusion entered a deferred prosecution agreement for violations of the Anti-Kickback Statute with respect to a specific CDS arrangement between Practice Fusion and Purdue Pharma.  The United States alleged in a criminal information that Practice Fusion had solicited remuneration from the company in exchange for embedding a CDS alert in its software "to prompt doctors to take certain clinical actions in order to increase prescriptions of . . . extended release opioids."  Practice Fusion represents that it has not sought, and does not seek, insurance coverage for liabilities relating to that CDS arrangement.

As relevant here, the excess policies apply in conformance with the terms of the primary policy, which contains two professional services exclusions.

The first exclusion applies only to claims against Practice Fusion itself, and bars coverage for "Loss in connection with any Claim made against [Practice Fusion] alleging, arising out of, based upon or attributable to any actual or alleged error, misstatement, misleading statement, act, omission, neglect or breach of duty committed, attempted or allegedly committed or attempted in connection with the rendering of, or actual or alleged failure to render, any professional services for others by any person or entity otherwise entitled to coverage under this D&O Coverage Part; . . . ."

The second exclusion, in an endorsement to the policy, is broader. It applies to all "Insureds" (that is, to individuals insured under the policy, as well as Practice Fusion), and bars coverage for "Loss in connection with any Claim made against any Insured . . . alleging, arising out of, based upon or attributable to an Insured's performance of or failure to perform professional services for others, or any act(s), error(s) or omission(s) relating thereto; . . . ."[4]

E.  *Proceedings in the Trial Court*

Practice Fusion filed a complaint in the superior court alleging two causes of action against the insurers for breach of contract. One cause of action pertained to the meaningful use claims; the other to the CDS claims. Practice Fusion alleged that the insurers' denial of coverage for the claims under the D&O policies was improper.

---

[4] The same professional services exclusions appeared in the D&O policies in effect at the time relevant to the meaningful use claims.

The insurers moved for summary judgment or in the alternative summary adjudication on each cause of action, arguing that the professional services exclusions in the policies barred coverage for both claims as a matter of law, because the claims arose from or related to Practice Fusion's professional services. The trial court denied summary adjudication on the cause of action pertaining to the meaningful use claims, but granted summary adjudication on the cause of action pertaining to the CDS claims. The trial court concluded that the undisputed facts established that the CDS claims "arose directly from [Practice Fusion's] provision of professional services, i.e., the design and implementation of the CDS [a]lerts under contract with the pharmaceutical companies, in alleged violation of accepted medical standards, and with the improper objective of encouraging healthcare providers to prescribe a specific drug or class of drugs."

Judgments were entered on the CDS claims cause of action for Freedom, Allied, Lloyd's, RSUI, and Wesco.[5] Practice Fusion's appeals from the judgments were consolidated by this court.

**DISCUSSION**

A. *Applicable Law and Standard of Review*

In an appeal from judgment entered after an insurer's motion for summary adjudication has been granted based on the interpretation or application of an insurance policy, we review the record de novo, and affirm "when the evidence shows that there is no triable issue of material fact and the [insurer] is entitled to judgment as a matter of law." (*Energy Ins. Mutual Limited v. Ace American Ins. Co.* (2017) 14 Cal.App.5th 281, 290 (*Energy Mutual*).)

_____

[5] The other insurers whose policies were part of the insurance tower are not parties to this appeal.

9

Our Supreme Court has explained the principles that govern in a case like this one, which involves the interpretation of language in an insurance policy. (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647-648.) "Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation," which " 'are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties' " at the time the contract was formed. (*Id.* at p. 647.) We infer that intent from the written provisions of the contract. (*Ibid.*) Our interpretation is controlled by the " 'clear and explicit' " meaning of the policy's provisions, which we interpret "in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.' " (*Id.* at pp. 647-648.) We interpret the coverage provisions of a policy " ' " 'broadly so as to afford the greatest possible protection to the insured, [whereas] . . . exclusionary clauses are interpreted narrowly against the insurer.' " ' " (*Id.* at p. 648.)

At issue in this case are exclusions that apply to losses connected to claims arising from "professional services for others." The term "professional services" is not defined in the policies and endorsements before us. California courts have construed " '[p]rofessional services' " as services " ' "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." ' " (*Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 713 (*Tradewinds*).) "It is a broader definition than 'profession,' and encompasses services performed for remuneration." (*Ibid.*; see also *Energy Mutual*, *supra*, 14 Cal.App.5th at p. 293 [professional services exclusions apply "broadly to bar coverage for damages resulting from a wide range of professional services

10

that extend 'beyond those traditionally considered "professions," such as medicine, law, or engineering' "].)

B.     *Analysis*

We conclude that the loss claimed by Practice Fusion as a result of its settlement with the United States as to the CDS alerts falls within the provisions in Practice Fusion's D&O policies that exclude coverage for claims "alleging, arising out of, based upon or attributable to an Insured's performance of . . . professional services for others, or any act(s), error(s) or omission(s) relating thereto."[6]

We begin by examining the language of the policies here, and we note that the professional service exclusion includes the term "arising out of," a term to which " 'California courts have consistently given a broad interpretation . . . in various kinds of insurance provisions," including policy exclusions. (*Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 830 (*Medill*).)  The term " 'does not import any particular standard of causation or theory of liability into an insurance policy.  Rather, it broadly links a factual situation with the event creating liability, and connotes only a minimal causal connection or incidental relationship.' "  (*Ibid.*)  " '[It] "requires [the court] to examine the conduct underlying the . . . lawsuit, instead of the legal theories attached to the conduct." ' "  (*Ibid.*)  What is more, the exclusion here extends beyond claims "arising out of" the performance of professional services, because it also covers claims "alleging, . . . based upon, or attributable to" the performance of professional services or "any act(s) . . . relating thereto."

---

[6] We focus our attention on the broader of the two exclusions at issue.

We turn next to the alleged conduct underlying the DOJ's allegations. As we have described, the DOJ alleged that Practice Fusion solicited and received remuneration from pharmaceutical companies in exchange for agreeing to "deploy within its . . . software" CDS alerts intended to promote the companies' products, and for "arranging for or recommending purchasing or ordering" the companies' products. The DOJ alleged that Practice Fusion allowed the pharmaceutical companies to "*participate* in designing" the alerts (italics added); the import of this allegation is that Practice Fusion had at least shared responsibility for design of the alerts. Practice Fusion concedes that under the contracts at issue, it agreed to modify its software to include the CDS alerts, which were targeted for particular patients with particular conditions based on selected guidelines, and that the guidelines used to develop the alerts were agreed upon by Practice Fusion and the pharmaceutical companies with which it contracted.[7] Practice Fusion's role in designing the alerts is further reflected in the provision in its form contract that it will provide the pharmaceutical company with "[v]isual and narrative depictions" of the CDS alerts that are the subject of the contract.

The contracts between Practice Fusion and the pharmaceutical companies are premised upon Practice Fusion providing the companies with professional services. The services contemplated by the contracts are " 'professional' " in that they " ' "aris[e] out of . . . employment involving

_____

[7] Practice Fusion submitted a declaration from its cofounder, Jonathan Malek, who stated that "the clinical/medical teams for both the sponsor of the CDS alert and for Practice Fusion agreed on which medical guidelines and/or clinical qualities measures would be used to define the sponsored CDS alert." Malek further stated, that "[o]nce the medical guidelines . . . that would be used to define the sponsored CDS alert were agreed to, Practice Fusion would then do any programming necessary to implement the logic of the CDS alert into" its software.

12

specialized knowledge . . . or skill [that] is predominantly mental or intellectual, rather than physical or manual." ' " (*Tradewinds*, *supra*, 97 Cal.App.4th at p. 713.)

For example, Practice Fusion's form contract with the pharmaceutical companies provided that the alerts would be coded so that they would be delivered to the screens of healthcare providers using Practice Fusion's software "based on the [agreed-upon] Guidelines to support the treatment of [the provider's] patients who are recommended to receive the treatments specified in the Guidelines." Practice Fusion admits that the coding of the alerts, that is, the modification of its software to incorporate the contracted-for CDS alerts in the appropriate contexts, is a professional service. (See *Navigators Specialty Insurance Company v. Double Down Interactive, LLC* (W.D.Wash. 2019) 2019 WL 3387458, at *5 ["designing and coding online games might be considered a professional service"].)

As another example, an "Order for Services" between Practice Fusion and a pharmaceutical company, where the "services" include the deployment of CDS alerts in Practice Fusion's software, contains representations and warranties by Practice Fusion that it will "perform all of its obligations under this Agreement . . . *in a . . . professional . . . manner*, in accordance with generally accepted industry and *professional standards* applicable to the Services," and that its "[p]ersonnel shall be well qualified, with applicable technical and *professional expertise* to perform such Services." (Italics added.) And a "Service Agreement" with another pharmaceutical company requires that in performing services (including Practice Fusion providing CDS alerts in its software) Practice Fusion must use its "commercially reasonable efforts, *expertise and skill*" and is "responsible for providing all

13

*appropriately trained and qualified personnel* to perform" those services. (Italics added.)

From all of this we conclude that the CDS claims, which Practice Fusion settled, are claims "alleging, arising out of, based upon or attributable to [Practice Fusion's] performance of . . . professional services for others, or . . . act(s) . . . relating thereto," specifically to Practice Fusion designing and coding CDS alerts for the pharmaceutical companies with which it contracted. Accordingly, the loss connected to the settlement of the DOJ's claims regarding the CDS alerts is barred by the professional services exclusion in Practice Fusion's D&O policies, and respondents were entitled to summary adjudication on the cause of action as to the CDS alerts.

We are not persuaded by Practice Fusion's arguments to the contrary. We begin with Practice Fusion's two primary arguments: first, that it did not provide professional services for the pharmaceutical companies, but instead sold them a product, which was advertising space on its software platform,[8] and second, that even though the coding of CDS alerts constitutes a professional service performed by its employees, any coding was done for Practice Fusion *itself* as part of the development of its software and not for the pharmaceutical company clients who paid for the CDS alerts.

Practice Fusion's argument that the CDS alerts claims concern mere advertising is premised on a misreading of the scope of the DOJ's allegations. The DOJ's allegations were not limited to allegations that Practice Fusion

---

[8] Practice Fusion's argument that it was providing a product (advertising space) rather than professional services rests in part on assertions about the operation of navigation software and the legal status of the work done by the individuals who create the computer code that implements advertisements in that software. We disregard those assertions, which are not supported by any citations to evidence or legal authority.

14

embedded improper advertising in its software. The DOJ alleged that Practice Fusion deployed improper CDS alerts in its software, and that Practice Fusion played a role in designing the alerts. The allegations that Practice Fusion allowed the pharmaceutical companies to "participate in" the design of the alerts, and "in some cases" allowed the pharmaceutical companies to draft the language; and that Practice Fusion "arrang[ed] for or recommend[ed] purchasing or ordering of a good or item" refer to more than the placement of advertising. Similarly, the terms of the agreements between Practice Fusion and the pharmaceutical companies that are cited in the DOJ allegations show that, contrary to Practice Fusion's assertion, Practice Fusion was not simply "develop[ing its] software product to include advertising or sponsorships." Practice Fusion was collaborating with companies to develop and deploy the alerts that Practice Fusion would embed in its software.

Further, the cases on which Practice Fusion relies for the proposition that advertising is not a professional service have no application to the facts of this case. They all involve a company advertising its own services, and they say nothing about whether professional services exclusions apply to actions taken by a software company to embed the advertisements of another company in its software. (See *Westport Ins. Corp. v. Jackson National Life Ins. Co.* (Ill.App. 2008) 900 N.E.2d 377, 414 [insurance agency does not provide professional service when it transmits an advertisement to potential customers in which it offers to provide its professional services]; *Rob Levine & Associates Ltd., v. Travelers Cas. & Sur. Co. of America* (D.R.I. 2014) 994 F.Supp.2d 228, 232-233 [law firm's advertising of its services is not the provision of professional services, so "Legal Practices Exclusion," which applies to claims arising from " 'related to the rendering of, or failure to

15

render, professional services,' " does not apply to false advertising claim against firm]; *Corky McMillin Construction Services, Inc. v. U.S. Specialty Ins. Co.* (9th Cir. 2015) 597 Fed. Appx. 925, 926 [allegations that insured made misstatements in its marketing materials do not clearly allege that insured provided "services," and therefore an ambiguous exclusion applying to claims arising from "services performed for or on behalf of customers or clients" does not apply to bar coverage].)

In contrast, courts have held that an insured provides professional services when it designs and implements a marketing program for another entity. For example, the court in *TrialCard Inc. v. Travelers Cas. & Sur. Co. of America* (E.D.N.C. 2020) 2020 WL 1609483 (*TrialCard*) held that an insured's design, production, and implementation of a marketing program for a pharmaceutical company are professional services for others that were excluded from coverage under a D&O policy. (*Id.* at *3.) The marketing program involved the insured hiring an outside vendor to send fax advertisements to pharmacies. (*Id.* at *1.) The court observed that the exclusion would not apply if the only service at issue was sending faxes, but that was not the case, because the insured's liability arose from its design and marketing of the program. (*Id.* at *3.) We are not persuaded by Practice Fusion's position that its providing automated CDS alerts is akin to sending faxes. And although Practice Fusion attempts to distinguish itself from the insured in *TrialCard* by contending that it "did not design the sales campaign—i.e., the [g]uidelines—for the pharmaceutical manufacturers," there is undisputed evidence that Practice Fusion was involved in selecting the guidelines, which, it concedes, were "agreed upon by the parties."

In arguing that it provided a product (advertising space) rather than a service, Practice Fusion relies on *Leverence v. U.S. Fidelity & Guarantee*

16

(Wis.Ct.App. 1990) 462 N.W.2d 218, 227 for the proposition that where "the primary objective of the insured's activity" results in a product or commodity, a professional services exclusion does not apply, and then contends, without evidentiary support, that "[t]he primary objective" of the CDS alert contracts "was for Practice Fusion to deliver a product [that is, its electronic health records software] that would perform certain (allegedly illicit) functions for the users of the [s]oftware (*i.e.*, healthcare providers)." But *Leverence* has no application here.[9]  In that case, the insured was a designer and manufacturer of prefabricated homes who was sued by homeowners who alleged that the homes retained excessive moisture in their exterior walls, promoting mold and other toxins that constituted a health risk and decreased the value of the homes. (*Id.* at p. 222.) The " 'malpractice and professional service' " exclusions in the insured's policies did not apply because the homeowners' claims arose from the manufacture of an allegedly defective product, and not from malpractice in rendering a professional service. (*Id.* at p. 226.) Although the insured's services (such as design and engineering services) were used in the production of the homes, the occupants of the homes "sought not merely the design of a home but rather the prefabricated home itself." (*Id.* at p. 227.) Noting that there was a difference between a contract for professional services and a contract for the end product of the services, the court held that the proper focus in applying the exclusion should be on the " 'end product' "—that is, the homes for which the homeowners had contracted—and that therefore the professional services exclusion did not apply. (*Ibid.*) This appeal is different: the contracts that gave rise to the DOJ's allegations against Practice Fusion are not contracts in which Practice

---

[9] *Leverence* was overruled on other grounds by *Wenke v. Gehl Co.* (Wis. 2004) 682 N.W.2d 405, 408.

Fusion agreed to provide the pharmaceutical companies with products; they are contracts in which a major objective was for Practice Fusion to provide the companies with services by deploying CDS alerts in its software and by "arranging for or recommending" that healthcare providers prescribe their products.

Nor are we convinced by Practice Fusion's argument that the coding of the CDS alerts was not performed for the pharmaceutical companies. There is no dispute that the CDS alerts were embedded in Practice Fusion's "off the shelf" software that it made available to healthcare providers. And there is no dispute that Practice Fusion benefited from the work done by its employees in coding those alerts. The undisputed fact remains that the coding was performed as a service to the pharmaceutical companies, who paid fees to Practice Fusion under agreements that required Practice Fusion to embed the alerts in its software, subject to the pharmaceutical companies' right to review and approve the CDS alerts that would appear in the software.[10] The DOJ's allegations likewise reflect that Practice Fusion was providing services for the pharmaceutical companies: the DOJ alleged that the purpose of the contracted-for CDS alerts was to increase sales for the pharmaceutical companies. These alerts were, at least in some cases "designed to encourage users to prescribe a specific product or class of products," to the financial benefit of the pharmaceutical companies.

---

[10] In his declaration, Practice Fusion cofounder Malek stated that as part of its agreements with the pharmaceutical companies "Practice Fusion would typically agree to embed a properly functioning CDS alert in its [s]oftware as a 'deliverable,' *as the pharmaceutical companies wanted to ensure the sponsored CDS alert functioned as agreed upon*." This indicates that the coding of the CDS alerts was for the benefit of the pharmaceutical companies, even if it was also for the benefit of Practice Fusion.

Accordingly, the loss for which Practice Fusion sought coverage was "in connection" with a claim against Practice Fusion "alleging, arising out of, based upon or attributable to" Practice Fusion's "performance of . . . professional services for others," specifically, for the pharmaceutical companies with which it contracted.

In addition to its primary arguments, Practice Fusion asserts that the CDS claims arose from its allegedly unlawful solicitation and receipt of remuneration for referrals generated by the CDS alerts embedded in its software, rather than from its coding of the alerts, and that the "core allegation" by the DOJ was that "the purpose of the CDS [a]lerts was 'the anticipated financial benefit to the pharmaceutical manufacturers from increased sales of pharmaceutical products that would result from CDS alerts.'" Practice Fusion argues that the design and coding required to implement the contracted-for CDS alerts was "*at most* incidental to the alleged . . . violations." Leaving aside the fact that conduct that has only an "incidental relationship" to the event creating liability can trigger an exclusion that uses the term "arising out of" (*Medill, supra*, 143 Cal.App.4th at p. 830), in making this argument Practice Fusion disregards the allegations by the DOJ that address the implementation of the alerts and therefore directly implicate Practice Fusion's provision of professional services to the pharmaceutical companies, including the allegation that although the alerts appeared to providers as providing unbiased information they were designed to encourage users to prescribe certain products, and that the conduct in which Practice Fusion had engaged included "solicit[ing] and receiv[ing] remuneration . . . in return for arranging for or recommending purchasing or ordering of" the pharmaceutical companies' products. We

19

interpret this as an allegation that Practice Fusion did in fact "arrang[e] for or recommend[ ]" the purchasing or ordering of the manufacturers' products.

In a related argument, Practice Fusion contends that the CDS alert claims did not arise out of any provision of professional services because the DOJ alleged that the violations of the Anti-Kickback Statute occurred when the contracts were executed, before any of the purported services were provided. But even if the actual execution of the contracts was somehow unrelated to Practice Fusion's provision of professional services, the DOJ also alleged conduct that involved the provision of professional services that occurred after the contracts were signed. (See *Medill*, *supra*, 143 Cal.App.4th at p. 830 [the term " 'arising out of' " implicates the conduct underlying a suit].) Practice Fusion focuses on the DOJ's allegation that the offending contracts were executed between November 2013 and August 2017. But the DOJ also alleged conduct that must have occurred after contracts were executed. Not only did the DOJ allege that "the CDS alerts appeared to healthcare providers as unbiased," which indicates that the alerts were coded into the software, but also the DOJ effectively alleged that the contracted-for CDS alerts were in place between April 2014 and April 2019 by alleging that claims submitted by providers between those dates "which were tainted by these kickbacks are false claims."

In sum, we are not persuaded by Practice Fusion's arguments that the DOJ's claims against Practice Fusion did not arise from Practice Fusion providing professional services for others.[11]

---

[11] We need not address Practice Fusion's argument that the trial court erred in finding that Practice Fusion "designed the [G]uidelines used for the CDS alerts," because our opinion does not rest upon such a finding. Likewise, we need not address Practice Fusion's argument that its "liability did not

## DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs on appeal.

---

arise out of any data collection services or real-world studies it provided to certain customers."

_____
Miller, J.

WE CONCUR:


_____
Stewart, P. J.


_____
Richman, J.


A167130, A167886, *Practice Fusion, Inc. v. Freedom Specialty Insurance Company et al.*