Filed 7/11/17 Certified for Publication 8/10/17 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ENERGY INSURANCE MUTUAL LIMITED,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY,<br><br>      Defendant and Respondent. | A140656<br><br>(Contra Costa County<br>Super. Ct. No. MSC11-00600) |

This insurance coverage dispute arises from a massive explosion that occurred when an unmarked petroleum pipeline was struck by an excavator. Numerous lawsuits were filed against a range of defendants, including the pipeline owner and the staffing agency providing personnel to the pipeline. After settling the lawsuits against the pipeline owner, an excess insurer for the pipeline sought to recover defense costs and settlement payments from the staffing agency's insurer. The staffing agency's excess insurance policy excluded damages arising from professional services. We affirm summary judgment in favor of the staffing agency's insurer, finding the policy excluded the claims in the underlying lawsuits.

## I. BACKGROUND

### A.    *The Parties and the Underlying Actions*

Kinder Morgan, Inc., together with its affiliated companies (Kinder Morgan), owns and operates thousands of miles of oil and gas pipelines. Kinder Morgan was

insured under an "Excess Liability Insurance Policy" by Associated Electric & Gas Insurance Services Limited (AEGIS) with a liability limit of $35 million per occurrence, subject to a self-insured retention (SIR)[1] of $1 million per occurrence for "General Liability." In addition, Energy Insurance Mutual Limited (EIM) insured Kinder Morgan under a "Following Form Excess General Liability Indemnity Policy,"[2] with a liability limit of $100 million per occurrence, excess to the AEGIS policy limit of $35 million.

Comforce Corporation (Comforce) is a staffing company that supplies businesses with temporary employees in a variety of contexts. Comforce has been providing employees to Kinder Morgan entities since the late 1980s. ACE American Insurance Company (ACE) insured Comforce under a primary commercial general liability (CGL) policy with a limit of $1 million per occurrence. ACE also issued Comforce a stand-alone "Commercial Umbrella Liability Policy"[3] (the umbrella policy) with a $25 million

---

[1] A SIR " 'refers to a specific sum or percentage of loss that is the insured's initial responsibility and must be satisfied *before* there is any coverage under the policy. It is often referred to as a "self-insured retention" or "SIR." ' [Citation.] Unlike a deductible, which generally relates only to damages, a SIR also applies to defense costs and settlement of any claim." (*Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466, 1473-1474.) With regard to an insurer's indemnity obligation, a SIR sits below the policy limits, and for this reason it is often analogized to primary insurance. (1 New Appleman on Insurance Law Library Edition (2009) Self-insured Retentions Versus Large or Matching Deductibles, § 1A.02[3][a], p.1A-10 (Rel. 16-12/2016 Pub. 60087).) Respondent argues that EIM mischaracterizes the SIR as primary insurance, which would make AEGIS a first-level excess insurer and EIM a second-level excess insurer. According to ACE, the AEGIS policy functions as primary insurance and the EIM policy is a first-level excess above it. Nevertheless, the resolution of the instant appeal does not require us to analyze the issue of policy exhaustion.

[2] A "following form" excess policy, unlike a "stand alone" policy incorporates by reference the terms, conditions, and exclusions of the underlying policy. (4 New Appleman on Insurance Law Library Edition, *supra,* Excess Insurance and Umbrella Coverage, § 24.02 [2][c], p. 24-15 (Rel. 15-9/2016 Pub. 60087).)

[3] In its brief, ACE refers to the policy as both an "excess commercial umbrella liability" and an "umbrella policy." An umbrella policy, like an excess policy, protects an insured against liability that exceeds the limits of primary coverage. (4 New Appleman on Insurance Law Library Edition, *supra,* Excess Insurance and Umbrella Coverage, § 24.02 [3] & [4], pp. 24-17-24-18.) Although similar, the two types of

2

limit per occurrence. The umbrella policy contained a professional services exclusion regarding claims arising out of the provision or failure to provide "services of a professional nature." Comforce was also insured under a "Specified Professions Professional Liability Insurance" policy by Steadfast Insurance Company, with coverage of up to $5 million per claim.

In keeping with their long-standing business relationship, Kinder Morgan hired two temporary employees through Comforce to work as construction inspectors on a large water supply line project being constructed for the East Bay Municipal Utility District (EBMUD) in Walnut Creek. Comforce did not train or supervise the employees. Kinder Morgan selected and trained the inspectors. According to the job description, construction inspectors were required to ensure compliance with engineering specifications, safety standards, and industry codes. Kinder Morgan also required inspectors to have knowledge of the practices, principles, procedures, regulations, and techniques as they related to terminal pipeline construction. Inspectors were also required to have the ability to understand and interpret construction drawings, maps, and blueprints. Though not required, an ideal inspector would have had a minimum of 10 years of experience in petrochemicals and/or a bachelor's degree in mechanical, civil, or electrical engineering.

Kinder Morgan also had one of its own employees at the Walnut Creek project, who acted as a line rider. The line rider's primary function was to perform daily surveillance of the designated pipeline area, in order to protect and ensure the integrity of the pipeline system by avoiding third party damage. Part of the line rider's responsibilities involved pipeline identification, including locating and marking lines, as

---

policies differ in a critical aspect—an umbrella policy expands coverage and acts as " 'gap filler,' " providing first dollar coverage for certain risks that are not covered by a primary or excess policy. (*Id.* at p. 24-18) In the instant case, first dollar coverage is not at issue and, as such, we need not determine whether the ACE policy is a true excess or umbrella policy. For consistency purposes, we shall use ACE's terminology and shall refer to the policy as an umbrella policy.

3

well as replacing damaged or missing markers. The job requirements included passing and maintaining "all applicable Operator Qualification requirements." A line rider needed to "quickly become knowledgeable of all applicable federal and state relations, most notably Part 196 of the Code of Federal Regulations."[4] Desired experience also included basic knowledge of cathodic protection, as well as knowledge of piping, valves, pressures, and pipeline operations.

On November 9, 2004, an excavator operated by Mountain Cascade, Inc. (MCI), EDMUD's contractor at the Walnut Creek project, punctured a high-pressured petroleum line owned by Kinder Morgan. Gasoline was released into the pipe trench and was ignited by the welding activities of Matamoros Pipelines, Inc., a subcontractor working for MCI. The resulting explosion and fire killed five employees and seriously injured four other employees. Extensive property damage also occurred.

Following the explosion, Cal/OSHA conducted an investigation and concluded that the primary cause of the accident was the failure to properly mark the petroleum pipeline. Cal/OSHA determined that "[s]everal employers failed to take required action and committed errors that contributed to the failure to determine and mark the location of the utility line." Cal/OSHA issued two "Serious Willful" citations to Kinder Morgan due to the failure of its employees to mark the location of the petroleum pipeline prior to the excavation activities to install the water line. Cal/OSHA also determined that Kinder Morgan "employees were aware that an unsafe condition existed and failed to assure that the utility was clearly marked which would have resulted in its relocation or other appropriate measures to safeguard employees."

Numerous wrongful death and personal injury lawsuits were filed against several defendants, including Kinder Morgan and Comforce. The underlying lawsuits largely alleged that the pipeline rupture was caused by the negligence of the parties, including Kinder Morgan and Comforce, in failing to identify and mark the location of the Kinder

---

[4] Part 196 of the Code of Federal Regulations is found in the Federal Transportation Regulations (49 C.F.R.), and pertains to the "Protection of Underground Pipelines from Excavation Activity."

Morgan pipeline, and by failing to properly supervise contractors who were working near the pipeline. Additional theories of liability were asserted against Kinder Morgan, including premises liability, nuisance, trespass, and strict liability for ultrahazardous activities.

Kinder Morgan sought coverage for the lawsuits under its AEGIS and EIM excess commercial CGL policies, and also under Comforce's primary and umbrella CGL policies with ACE. AEGIS and EIM participated in Kinder Morgan's defense of the actions. ACE agreed to participate in Kinder Morgan's defense under Comforce's primary CGL policy, but under a reservation of rights. ACE declined coverage under Comforce's umbrella policy, in part, on the grounds that the claims were excluded from coverage.

Each of the underlying lawsuits against Kinder Morgan was settled prior to trial. When the AEGIS policy limit was exhausted through payments of defense costs and settlements, EIM agreed to pay more than $30 million to reimburse Kinder Morgan for the settlements resolving the underlying lawsuits.

## B.  *The Instant Coverage Dispute*

EIM commenced this action against ACE on March 16, 2011, seeking full reimbursement of the payments it made to Kinder Morgan under its excess policy, up to the full $25 million limit of Comforce's umbrella policy with ACE. In its amended complaint, EIM alleged that Kinder Morgan was covered as an additional insured under Comforce's umbrella policy. EIM further alleged that the defense costs and settlement payments disbursed in connection with the underlying lawsuits should have been paid by ACE because the ACE umbrella policy was a "first-level excess policy" and the EIM policy was a "second-level excess policy." EIM asserted claims for equitable subrogation, equitable contribution, and equitable indemnity against ACE.

EIM moved for summary adjudication of its equitable subrogation claim. ACE filed its own motions for summary judgment, arguing that: 1) the professional services exclusion categorically precluded coverage under the Comforce umbrella policy; 2) EIM could not state a claim for equitable subrogation against ACE; 3) EIM's equitable

5

contribution and equitable indemnity claims were barred by the statutes of limitations; and 4) Kinder Morgan was not an additional insured under Comforce's policies with ACE.

On August 13, 2013, the trial court issued its tentative rulings on the parties' motions. The court granted ACE's motion on the grounds that the claims in the underlying litigation fell within the ambit of the professional services exclusion, which the court found was set forth in "clear" policy language. In light of that ruling, the trial court held ACE's other motions regarding equitable subrogation and statute of limitations to be moot. The court, however, also denied ACE's motion based on the additional insured provision, determining there was a triable issue of fact as to whether there was an agreement between Comforce and Kinder Morgan that made Kinder Morgan an additional insured under Comforce's policies. The instant appeal followed. The court denied EIM's motion on the ground that professional service exclusion precluded coverage for the claims against Kinder Morgan.

## II. DISCUSSION

At issue is whether the trial court properly determined that the tort claims asserted against Kinder Morgan arose from performance or non-performance of services of a professional nature. The gist of EIM's position is that application of the professional liability exclusion to the underlying claims defeated Kinder Morgan's reasonable expectation of coverage as an additional insured under the ACE policies issued to Comforce, by rendering coverage provided therein illusory. EIM contends that even if the exclusion applied, it barred coverage only as to Comforce not to Kinder Morgan due to the "Separation of Insureds" provision. ACE counters that the underlying lawsuits were indisputably based on the failure to adequately perform the pipeline-locating services by both Comforce and Kinder Morgan, which were unquestionably professional in nature.

### A.    *Standard of Review and Principles of Insurance Policy Interpretation*

On appeal, after a motion for summary judgment has been granted based on an interpretation of application of the provisions of an insurance policy, "we review the

6

record de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; *Palp, Inc. v. Williamsburg National Ins. Co.* (2011) 200 Cal.App.4th 282, 289 (*Palp*).)) A defendant is entitled to summary judgment when the evidence shows that there is no triable issue of material fact and the defendant is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) In making this determination, courts view the evidence, including all reasonable inferences supported by that evidence, in the light most favorable to the nonmoving party. (Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra,* 25 Cal.4th at p. 843.)

"Interpretation of an insurance policy is primarily a judicial function. When the trial court's interpretation did not depend upon conflicting extrinsic evidence, the reviewing court makes its own independent determination of the policy's meaning." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 35-36 (*Armstrong*).) " ' "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." [Citations.] "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' [Citation.]" (*Powerline Oil Co. Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 (*Powerline*); accord, *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27.)

"Words in an insurance policy are to be interpreted as a layperson would interpret them, in their ' "ordinary and popular sense." ' [Citations.] . . . [¶] If particular policy language is ambiguous, it is to be resolved by interpreting the ambiguous provisions in accordance with the insured's objectively reasonable expectations." (*Armstrong, supra,* 45 Cal.App.4th at pp. 35-36.)

Whether policy language is ambiguous is a question of law that we review de novo. (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239,

7

1245.)  A policy provision is ambiguous when it is capable of two or more constructions, both of which are reasonable.  (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648 (*MacKinnon*).)  In determining the objectively reasonable expectations of the insured, "the court must interpret the language in context, with regard to its intended function in the policy.  [Citation.]  This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.'  [Citations.]"  (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265, italics omitted.)  " 'Courts will not strain to create an ambiguity where none exists.'  [Citation.]  ' " ' "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." [Citation.]'  [Citation.]" [Citation.]' [Citation.]" (*Palp, supra,* 200 Cal.App.4th at p. 290.)

"An insurance policy's coverage provisions must be interpreted broadly to afford the insured the greatest possible protection, while a policy's exclusions must be interpreted narrowly against the insurer.  [Citation.]  The exclusionary clause must be ' "*conspicuous, plain and clear.*" '  [Citation.]  'This rule applies with particular force when the coverage portion of the insurance policy would lead an insured to reasonably expect coverage for the claim purportedly excluded.'  [Citation.]"  (*Palp, supra,* 200 Cal.App.4th at p. 290.)

## B.    *The Professional Services Exclusion Precludes Coverage*

EIM contends that the professional liability exclusion in ACE's policy is "ill-defined" and should not be enforced.  The policy exclusion is contained in an endorsement entitled "Professional Liability Exclusion," which states that it "modifies insurance provided" under the commercial umbrella liability policy.  The exclusion specifies:  "This insurance does not apply to any liability arising out of the providing or failing to provide any services of a professional nature."  The policy does not further define professional liability or "services of a professional nature."

8

In order to ascertain the scope of an exclusion, we must first consider the coverage language of the policy. (See *MacKinnon, supra,* 31 Cal.4th at p. 649.) A CGL policy is intended to cover *general* liability, not an insured's professional or business skill. (*Ray v. Valley Forge Ins. Co.* (1999) 77 Cal.App.4th 1039, 1047.) Often referred to as a business general liability policy, a CGL policy provides liability insurance for businesses. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 (*Waller*).) "The policy is written in two essential parts: the insuring agreement, which states the risk or risks covered by the policy, and the exclusion clauses, which remove coverage for risks that would otherwise fall within the insuring clause." (*Waller, supra,* 11 Cal.4th at p. 16.) In general, "CGL policies are limited to providing coverage for accidental occurrences, and do not provide coverage for professional negligence claims. [Citation.]" (*Tradewinds Escrow, Inc. v. Truck Ins. Exchange* (2002) 97 Cal.App.4th 704, 713 (*Tradewinds*).) As a result, "CGL policies often contain exclusions for loss resulting from the rendering of or failure to render professional services. [Citation.]" (*Ibid.*)

Here, Comforce's umbrella CGL policy obligated the insurer to pay, in part, "all sums that the INSURED shall become legally obligated to pay as damages because of BODILY INJURY . . . ." Our Supreme Court has said of similar language that it "connotes general protection for alleged bodily injury caused by the insured." (*Gray v. Zurich Ins. Co.* (1966) 65 Cal.2d 263, 272.) "This language establishes a reasonable expectation that the insured will have coverage for *ordinary acts of negligence* resulting in bodily injury. [Citation.]" (*MacKinnon, supra,* 31 Cal.4th at p. 649, italics added.) Coverage will therefore be found unless the professional liability exclusion conspicuously, plainly and clearly apprises the insured that certain acts of professional negligence will not be covered. (*Ibid.*) While the absence of a definition can weigh in favor of finding an ambiguity, the term "professional services"—or, as in this case, "services of a professional nature"—does not lack a generally accepted meaning outside the context of the policy. (See *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867; see also *Powerline, supra,* 37 Cal.4th at p. 390; *Amex Assurance Co. v. Allstate Ins. Co.* (2003) 112 Cal.App.4th 1246, 1252 (*Amex*).)

9

California courts have defined " 'professional services' " as those " ' "arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual." " [Citation.] It is a broader definition than 'profession,' and encompasses services performed for remuneration. [Citation.]" (*Tradewinds, supra,* 97 Cal.App.4th at p. 713.) However, "it is the *type of activity*, rather than actual compensation, that controls whether the professional services . . . exclusion[] appl[ies]." (*Amex, supra,* 112 Cal.App.4th at p. 1252, italics added [no coverage under plumber's homeowner's policy for negligent work performed without charge for friend].)

EIM argues that application of the professional services exclusion has "generally been limited to ear-piercers and plumbers who sought coverage outside of the general liability context." EIM's narrow interpretation of professional services, however, runs counter to the relevant case law. Courts have applied the professional services exclusion broadly to bar coverage for damages resulting from a wide range of professional services that extend "beyond those traditionally considered 'professions,' such as medicine, law, or engineering." (*Hollingsworth v. Commercial Union Ins. Co.* (1989) 208 Cal.App.3d 800, 806-807 (*Hollingsworth*) [store employee negligently pierced customer's ears]; see *Medill v. Westport Ins. Corp.* (2006) 143 Cal.App.4th 819, 833 (*Medill*) [nonprofit defaulted on payment of municipal bonds]; *Amex, supra,* 112 Cal.App.4th at p. 1252 [plumber installing water heater]; *Tradewinds, supra,* 97 Cal.App.4th at p. 713 [negligent performance of escrow services]; *Northern Insurance Co. v. Superior Court* (1979) 91 Cal.App.3d 541, 544 [negligent performance of abortion on wrong patient despite clerical error in mixing up patient charts]; *Antles v. Aetna Casualty & Surety Co.* (1963) 221 Cal.App.2d 438, 439 (*Antles*) [patient injured by defective heat lamp during chiropractic treatment]; see also *Admiral Ins. Co. v. Ford* (5th Cir. 2010) 607 F.3d 420, 426 [expertise in drilling services]; *Natural Gas Pipeline Co. v. Odom Offshore Surveys, Inc.* (E.D. La. 1988) 697 F.Supp. 921, 928 [exclusion applied to surveyor]; *Womack v. Travelers Ins. Co.* (La.Ct.App. 1971) 251 So.2d 463, 464 [pipeline ruptured after engineers failed to send plans verifying location of pipeline].)

Here, the activities involved in owning and operating a pipeline, including mapping and marking underground installations are clearly analogous to other skilled services that have been held to be "professional services." (See *Amex, supra,* 112 Cal.App.4th at p. 1252 [noting that "[c]ontrasted to the minimal education required for ear piercing, a plumber has the equivalent of a Ph.D."]; *Hollingsworth, supra,* 208 Cal.App.3d at pp. 807-809.) Construction inspectors were required to have specialized knowledge in various facets of pipeline construction, including understanding and interpreting construction maps, drawings, and blueprints; ideal training would have included a minimum of 10 years of experience in petrochemicals, and/or a bachelor's degree in mechanical, civil, or electrical engineering. Similarly, line riders were required to have specialized knowledge in pipeline identification, including locating and marking lines; desired experience would have included knowledge of cathodic protection, piping, valves, and pressures.

The tasks assigned to construction inspectors and line riders reflect the professional nature of the services they were expected to render. These expectations are further reflected in Kinder Morgan's statutory obligations as a pipeline owner. Pursuant to Government Code section 4216.3 at subsections (a)(1)(A)(i) & (a)(2), Kinder Morgan was required to have a "qualified person" locate and mark the underground pipeline. (See also Gov. Code, § 4216, subds. (o) & (p).) For this purpose, " 'qualified person' " means a person who completed a training program in accordance with the requirements of Section 1509 of Title 8 of the California Code of Regulations Injury and Illness Prevention Program, that meets the minimum locators training guidelines and practices published in the most recent version of the Best Practices guide of the Common Ground Alliance." (Gov. Code, § 4216, subd. (p); Cal. Code. Reg., tit. 8, § 1504 [defining qualified person as "[a] person designated by the employer who by reason of training, experience or instruction has demonstrated the ability to safely perform all assigned

duties . . . .")[5] The failure to mark the pipeline squarely falls within the ambit of the professional services exclusion.

Nevertheless, relying on *North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902 (*North Counties*), EIM asserts that the professional services exclusion does not apply in the instant case. In *North Counties,* an engineering firm constructed a dam for a winery based on the winery's specifications. (*Id.* at p. 906.) In 2000, after the dam was completed, the engineering firm was later sued by third parties in two lawsuits alleging property damage arising from the dam construction. (*Id.* at p. 905, 929-930.) The engineering firm tendered defense of the lawsuits to its insurer. (*Ibid.*) From 1991 until 2000, the insurer had provided the engineering firm with both CGL coverage and Products-Completed Operations (PCO) coverage.[6] (*Id.* at p. 907.)

---

[5]    EIM suggests that because Kinder Morgan was statutorily required to mark the pipeline, Kinder Morgan's compliance with this mandate is somehow less professional in nature. In support of this assertion, EIM, citing *Excavation Techs., Inc. v. Columbia Gas Co.* (Pa. 2009) 985 A.2d 840, claims that complying with a statutory obligation falls outside of the "typical" definition of "professional service." EIM's reliance on this case is misplaced, as it did not involve the interpretation of the professional services exclusion or even involve an insurance coverage dispute. Rather, *Excavation Technologies* held that a public utility was not liable, on a negligent misrepresentation theory, for purely economic loss that a contractor sustained as the result of the utility's failure to comply with a statutory mandate to mark the location of all of gas lines around a construction site. (*Id.* at p. 842.) " 'It is axiomatic that cases are not authority for propositions not considered.' " (*Miklosy v. Regents of University of California* (2008) 44 Cal.4th 876, 900, fn. 7, quoting *People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.)

[6]    PCO covers liability for accidental bodily injury or property damage following completion and arising out of the insured's work or operations. (*Travelers Casualty & Surety Co. v. Employers Ins. of Wausau* (2005) 130 Cal.App.4th 99, 113-114.) This coverage is generally conditioned on damage occurring during the policy period, as long as the work was completed before the damage occurred. (See *Pennsylvania General Ins. Co. v. American Safety Indemnity Co.* (2010) 185 Cal.App.4th 1515, 1532-1533.) PCO "plainly includes all property damage occurring away from the insured's premises and arising out of the insured's work or products, with the exception of (1) products still in the insured's possession, and (2) work that has not yet been completed or abandoned." (*Clarendon America Ins. Co. v. General Security Indemnity Co. of Arizona* (2011) 193 Cal.App.4th 1311, 1318.) Because a hefty premium is charged for this coverage, some

12

However, when renewing the policy in April 2000, the insurer advised the insured that it did not provide PCO coverage to engineering companies, and therefore the renewal policy contained a "Products-Completed Operations Liability Exclusion Endorsement." (*Ibid.*) The renewal policy also excluded coverage for property damage " 'due to rendering or failure to render any professional services or treatments.' " (*Id.* at p. 908.) The policy defined " 'professional services or treatments' " to include " 'engineering, drafting, surveying or architectural services, including preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications' " and " 'supervisory or inspection services [.]' " (*Ibid.*)

The insurer denied coverage on the basis that the underlying claims arose as a result of the engineering firm's professional services, which was excluded under the policy's professional services exclusion, and thus PCO coverage was also excluded. (*North Counties, supra,* 224 Cal.App.4th at pp. 910-911.) The applicability of the professional services exclusion to the PCO coverage in the pre-2000 policies was the point of contention between the engineering firm and the insurer. (See *id.* at pp. 911-912.) The trial court sided with the insurer. (*Id.* at pp. 917-918.)

On appeal, the court in *North Counties* found the professional services exclusion did not preclude coverage, explaining there was evidence that, in addition to the professional engineering services, the insured also performed some ordinary labor and construction work in connection with the building of the dam. (*North Counties, supra,* 224 Cal.App.4th at p. 928.) Construction work, the court noted was "not within the policy definition of professional services." (*Ibid.*)

Contrary to EIM's assertion, *North Counties* neither "supplies the rule of decision in this case" nor "explains why . . . older cases do not control here." The court did not suggest that prior cases construing the professional services exclusion were wrongly decided. Rather, the court distinguished the cases proffered by the insurer as not

CGL policies contain endorsements that exclude this hazard. (See *Baker v. National Interstate Ins. Co*. (2009) 180 Cal.App.4th 1319, 1339, fn. 4.)

13

supporting an expansive interpretation of the professional services exclusion. (*North Counties, supra,* 224 Cal.App.4th at p. 929.) The court noted that the insurer's cases were distinguishable, in that none involved PCO coverage and its attendant complications and ambiguity. (*Ibid.*) *North Counties* also observed that in *Hollingsworth* and *Amex* "professional services" was not defined; the court further found that *Amex* did not support the insurer's position because it involved a homeowners policy. (*North Counties, supra,* 224 Cal.App.4th at p. 929.)

In any event, *North Counties* is distinguishable. To begin with, the policy in *North Counties* narrowly defined the term " 'professional services,' " with "a definition that did not include 'construction' or 'labor' or some of the other things [the insureds] were accused of in of causing the damage." (*North Counties, supra,* 224 Cal.App.4th at p. 929.) As such, the exclusion was narrowly construed. (*Ibid.*) Here, " 'professional services' " was not defined. Absent a specific policy definition, the "ordinary understanding of the term applies," (*Amex, supra,* 112 Cal.App.4th at p. 1252), and that understanding clearly includes "skilled services" (*ibid.*), such as mapping and marking an underground pipeline. Also, the alleged damage in *North Counties* occurred after the insureds' work was completed and based on work outside the scope of the engineering work. (*North Counties, supra,* 224 Cal.App.4th at p. 930.) Here, by contrast, the personal injury and wrongful death claims occurred during the project, as a result of the insureds' failure to properly mark the pipeline—the very thing they were supposed to perform. Finally, the instant case did not involve an issue of PCO coverage or exclusion.

*Food Pro Internat., Inc. v. Farmers Ins. Exchange* (2008) 169 Cal.App.4th 976 (*Food Pro*), another case cited by EIM, actually supports a finding that the "professional services" exclusion is applicable in the instant case. Food Pro, the insured, was an engineering firm providing consulting services to Mariani, a food processor, to assist it in the relocation of its operations. (*Id.* at p. 979.)

Part of Food Pro's work was to act as Mariani's representative in dealing with contractors and suppliers, to coordinate contractor activities on the project, and to make on-site inspections of the work to determine whether it was proceeding properly. (*Id.* at

14

p. 980.) A contractor removed a piece of equipment from the mezzanine of the plant, leaving a large hole in the floor. (*Ibid.*) Aamold, an employee of Food Pro on the scene, noticed the danger and notified employees of Mariani, who covered the hole, but did not bolt down the covering. Pettigrew, an employee of another contractor, fell through the hole and was severely injured. (*Ibid.*)

Pettigrew and his workers' compensation insurer made claims against Food Pro, alleging general negligence and premises liability. Food Pro's insurer, which had issued a CGL policy, denied coverage, based on the professional services exclusion. (*Food Pro, supra,* 169 Cal.App.4th at pp. 981-982.) That exclusion provided that the policy did not apply to " ' "bodily injury," . . . arising out of the rendering or failure to render any professional services by or for you, including: [¶] 1. The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs, specifications; and [¶] 2. Supervisory, inspection or engineering services.' " (*Id.* at p. 981.) Food Pro sued its insurer; the trial court sided with the insurer and found the bodily injury arose out of Food Pro's rendering of supervisory services, and was therefore excluded from coverage. Because there was no potential for coverage, there was no duty to defend. (*Id.* at p. 984.)

Food Pro appealed, arguing that the insurer and the trial court applied the "professional services exclusion so broadly that the exception [swallowed] the rule." (*Food Pro, supra,* 169 Cal.App.4th at p. 986.) The appellate court agreed. In reversing, the court acknowledged that Food Pro provided professional services to Mariani. (*Id.* at p. 988.) However, there was evidence that the insurer was advised from the outset that it was Mariani's responsibility to cover the hole in the floor, and Food Pro was not required to protect workers from injury or to ensure the safety of the site. (*Id.* at p. 987.) Food Pro's role was to determine when each piece of equipment was to be disconnected, but the individual contractors determined how to complete each project. (*Ibid.*) Food Pro's supervisory role was limited to coordination of the overall process, and the contractors were responsible for the details of their work. (*Ibid.*) The court concluded "Aamold [Food Pro's employee] was not providing supervisory or engineering services, or any

15

other specialized skill, in relation to Pettigrew's accident." (*Id.* at p. 988.) Rather, Food Pro's facts "suggest Aamold's involvement in the accident was merely as an observer who noticed the danger and notified the responsible party. Thus, any failure to rectify the situation or warn of the danger, as alleged in the Pettigrew complaint, would implicate only ordinary negligence." (*Ibid.*) The court rejected the insurer's contention that Aamold was only on site to perform professional duties, so any act of his on site that resulted in injury arose from a professional service. (*Id.* at p. 989.)

The *Food Pro* court then distinguished the insurer's cases, giving particular attention to *Tradewinds, supra,* 97 Cal.App.4th 704. (See *Food Pro, supra,* 169 Cal.App.4th at pp. 989-990.) In *Tradewinds,* the plaintiff sued an escrow company for wrongfully failing to close escrow on a home she sought to purchase. (*Tradewinds,* at pp. 707-709.) The escrow company's insurer refused to defend, citing a professional services exclusion. (*Id.* at p. 708.) The *Tradewinds* court, in considering the application of the exclusion explained "the unifying factor" in cases upholding the exclusions is "whether the injury occurred during the performance of the professional services, not the instrumentality of the injury." (*Id.* at p. 713.) *Food Pro* distinguished *Tradewinds* and similar cases (*Hollingsworth, supra,* 208 Cal.App.3d at pp. 803, 805, 808-809; *Antles, supra,* 221 Cal.App.2d at pp. 439-440; *Northern Insurance Co. v. Superior Court* (1979) 91 Cal.App.3d 541, 543), on the ground that "[t]he injury in each arose from the performance of a professional service, not merely at the same time the insured was otherwise providing professional services to a third party." (*Food Pro, supra,* 169 Cal.App.4th at p. 991, fn. 6.) In *Food Pro*, the only link between the engineering service and the injury was that the allegedly wrongful actions occurred while Food Pro was present at the site to provide professional consulting services to Mariani. (*Ibid.*) Food Pro's evidence established that "it did not design or direct the removal" of the equipment "nor did it direct Pettigrew's actions" at the time of the accident "as part of its professional services." (*Ibid.*) Rather, Food Pro's involvement in the Pettigrew incident arose from Aamold's "presence at the site, but the injury did not 'aris[e] out of the rendering or failure to render any professional services.' " (*Ibid.*)

16

Here, by contrast the underlying lawsuits allege that severe personal injuries and deaths arose from the failure to properly locate and mark the underground pipelines, which unquestionably involves more than the mere presence of Comforce and Kinder Morgan at the Walnut Creek site. EIM counters that the professional services exclusion does not apply because the underlying lawsuits alleged "ordinary, common law negligence," as well as "other actionable conduct," such as trespass and nuisance.

Although exclusions are generally construed narrowly (*MacKinnon, supra,* 31 Cal.4th at p. 648), California courts interpret the term " ' "arising out of" ' " broadly (*Health Net, Inc. v. RLI Ins. Co.,* (2012) 206 Cal.App.4th 232, 262). As used in various types of insurance provisions, including exclusions, the term " 'links a factual situation with the event creating liability and does not import any particular standard of causation or theory of liability into an insurance policy.' " (*Health Net, Inc. v. RLI Ins. Co., supra,* 206 Cal.App.4th at p. 262.) The term is generally understood to mean " ' "originating from[,]" "having its origin in," "growing out of" or "flowing from" or in short, "incident to, or having connection with". . . . [Citation.]' " (*Davis v. Farmers Ins. Group* (2005) 134 Cal.App.4th 100, 107; see also *Medill, supra,* 143 Cal.App.4th at pp. 829-830 [interpreting exclusion of claims " 'arising out of' breach of any contract" to preclude a duty to defend against tort and breach of fiduciary duty claims that were dependent on and inseparable from contract claims].)

The underlying personal injury and wrongful death actions theoretically raise some claims that do not arise out of Comforce's and Kinder Morgan's provision of or failure to provide professional services. However, where allegations in a complaint are " ' "inseparably intertwined" ' " with noncovered conduct, there is no coverage even where the nature of a particular claim appears to be covered. (See *Uhrich v. State Farm Fire & Casualty Co.* (2003) 109 Cal.App.4th 598, 615.) In *Medill, supra,* 143 Cal.App.4th 819, for example, the court declined to find a duty to defend for tort and breach of fiduciary duty claims because the policy excluded claims arising out of breach of contract, and all of the claims alleged arose out of duties and obligations that the insured had assumed under bond contracts. (*Id.* at p. 830.) Although the court

17

acknowledged that exclusions are construed narrowly, it nevertheless found that the " 'arising out of' " language operated to take the claims beyond the scope of coverage. (*Id.* at p. 829.)

Likewise in *Southgate Recreation & Park Dist. v. California Assn. for Park & Recreation Ins.* (2003) 106 Cal.App.4th 293, a developer contracted with a general contractor to build a golf course. When the general contractor went bankrupt, unpaid subcontractors sued the developer for payment for goods and services they had provided. (*Id.* at pp. 296-297.) The developer's insurer refused coverage because the policy excluded claims " '[a]rising out of or related to construction . . . contracts or to any other contract for the purchase of goods or services.' " (*Id.* at p. 301.) The developer argued that the claims were non-contractual and that the claims were based on negligent administration of the construction contract funds. (*Ibid.*) Finding in favor of the insurer, the court explained that the developer's "alleged negligence and breach of statutory duties arise out of or are related to the . . . construction contract. It is the [developer's] failure to retain funds under that very contract and [the developer's] failure to ensure an adequate payment bond for that very contract that comprise the basis of the subcontractor lawsuits against [the developer] for conversion, breach of trust, and violation of stop notice." (*Id.* at p. 302.)

Similarly here, the claims of "ordinary, common law negligence" and the so-called "other actionable claims" against Comforce and Kinder Morgan are "inseparably intertwined" with the non-covered conduct. Ultimately, it is the nature of the conduct, not the source of law that governs whether an exclusion applies. (*Medill, supra,* 143 Cal.App.4th at p. 830.) Thus, although the underlying cases also allege ordinary negligent acts and other causes of action, the gravamen of the actions is that Comforce and Kinder Morgan failed to mark the pipeline, the very thing they were required to perform at the site. It is Comforce's and Kinder Morgan's failure to render professional services that comprises the basis of the underlying lawsuits. Accordingly, the basic occurrence that caused the injuries (failure to mark the pipeline) was excluded from coverage by the CGL umbrella policy.

18

Even without a further definition expressly defining "professional services" or "professional liability," no reasonable insured could have expected that the CGL policy was intended to cover injuries caused by an insured's failure to perform the very services it promised to render. (See *Ray v. Valley Forge Ins. Co., supra,* 77 Cal.App.4th at pp. 1047-1048 [no CGL coverage for insured's professional advice regarding what roofing materials to use].) The professional services exclusion simply reconfirms that the policy was *not* intended to cover the insured's mistakes in how it provides promised services to others. (See *Tradewinds, supra,* 97 Cal.App.4th at p.713; see also *Elysian Investment Group v. Stewart Title Guaranty Co.* (2002) 105 Cal.App.4th 315, 324 [" 'an exclusion cannot act as an additional grant or extension of coverage' "].)

In this instance, that is even more clear as Kinder Morgan, like Comforce, could have purchased errors and omissions coverage but declined to do so. (See, e.g. *Bank of the West v. Superior Court, supra,* 2 Cal.4th 1254, 1276-1277 [rejecting broad interpretation of " 'advertising injury' " because insureds only reasonably expect such broad coverage by purchasing additional, e.g., errors and omissions, liability coverage]; *Allstate Ins. Co. v. Interbank Fin. Servs.* (1989) 215 Cal.App.3d 825, 831 [explaining that it was unreasonable for insured to expect CGL policy to cover securities fraud and noting that if such coverage had been desired a professional liability policy could have been obtained].) It can be reasonably inferred that, at the outset, Comforce understood that the ACE commercial umbrella policy provided no coverage for claims arising out of its professional services. Just as Comforce did not expect that its policy would cover claims of professional errors, Kinder Morgan could not reasonably expect that such claims would be covered under the policy.

C.     *The Additional Insured Endorsement and Separation of Insureds Clause Do Not Expand Coverage*

EIM next contends that "where a general liability policy includes an additional insured endorsement, a 'professional liability' exclusion, and a separation of insureds provision, the application of the exclusion must be assessed *separately* with respect to the named insured and to the additional insured." EIM continues, "the combination of an

19

additional insured provision with a separation of insureds provision can result in coverage for an additional insured even if the exclusion bars coverage for the named insured." Thus, according to EIM, even if we were "to determine that Comforce had liability arising out of the providing or failing to provide any services of a professional nature, the Kinder Morgan defendants provided no such services themselves, and so, . . . the exclusion cannot bar coverage for them."

Preliminarily, we note that we are not bound by EIM's self-serving statement that the Kinder Morgan defendants merely owned and operated the pipeline and did not provide any professional services. We need not accept EIM's legal characterization, only its factual allegations. (See, e.g., *Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 529 [adequate summary judgment declarations cite evidentiary facts, not legal conclusions or ultimate conclusions].) Indeed, as we shall explain, whether or not Kinder Morgan's alleged operations were professional in nature is the very question we must answer.

*1.    Background*

Inasmuch as the resolution of this issue requires an examination of the interplay of several policy provisions contained in two different policies, we provide the relevant portions of those policies below:

a.)    <u>ACE CGL Policy Provisions</u>

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM** [ACE Primary]

"[¶] . . . [¶]

"Throughout this policy the words 'you' and 'your' refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured [i.e. Comforce] under this policy.

"[¶] . . . [¶]

"The word 'insured' means any person or organization qualifying as such under Section II-Who Is An Insured."

"Other words and phrases that appear in quotation marks have special meaning. Refer to

"[¶]  . . . [¶]

"SECTION IV – [CGL] CONDITIONS

20

"[¶] . . . [¶]

"7. **Separation of Insureds**

"Except with respect to the Limits of Insurance, and any rights or duties . . . to the first Named Insured, this insurance applies:

      "a.  As if each Named Insured were the only Named Insured; and

      "b.  Separately to each insured against whom claim is made or 'suit' is brought.

**"SECTION V—DEFINITIONS**

"[¶] . . . [¶]

"22.   'Your [Comforce's] work':

      "a.    Means:

         "(1)   Work or operations performed by you [Comforce] or on you [Comforce's] behalf .]""

"[¶] . . .[¶]

The additional insured endorsement reads in part:

"**ADDITIONAL INSURED [ENDORSEMENT]**

"This endorsement modifies insurance provided under the . . .[¶] COMMERICAL GENERAL LIABILITY COVERAGE PART.

"Name of Person or Organization: [¶]  All interest as required by contract or agreement prior to loss."

"[¶] . . . [¶]

"WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule as an insured but only with respect to liability arising out of your [Comforce's] operations . . . ."

    b.)    ACE Umbrella Policy

**"Commercial Umbrella Liability Policy**

"WE, the Company named in the Declarations, relying upon the statements shown on the Declarations page and in the Schedule of UNDERLYING INSURANCE attached to this policy . . . and subject to the terms, conditions, exclusions, and limits of insurance of this policy, agree with YOU as follows:

"D.    PERSONS INSURED

    "1.    The Named Insured is the organization [i.e. Comforce] shown in the Declarations of this policy and includes:

"[¶] . . . [¶]

    "3.  Each of the following . . .:

"[¶] . . . [¶]

    "e. Any person or organization included as an Additional Insured in the UNDERLYING INSURANCE and for the full limits of liability shown therein, but only to the extent that such insurance is afforded said person or organization in the UNDERLYING INSURANCE.

"[¶] . . . [¶]

**"SECTION IV [CONDITIONS]**

["¶] . . . [¶]

"M.    SEPARATION OF INSUREDS

    "Except with respect to the Limits of Insurance this policy applies:

    "1.    As if each INSURED were the only INSURED;

    "2.    Separately to each INSURED against whom claim is made or SUIT brought."

"And, the professional services exclusion read in part:

**"PROFESSIONAL LIABILITY EXCLUSION []**

"[¶] . . . [¶]

**"THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

22

**"This endorsement modifies insurance provided under the . . .[¶] COMMERCIAL UMBRELLA LIABILITY POLICY.**

"This insurance does not apply to any liability arising out of the providing or failing to provide any services of a professional nature."

    2.    *Analysis*

    EIM argues that the professional services exclusions does not apply to Kinder Morgan. EIM contends that the trial court did not properly apply the separation of insureds provision. EIM posits that, by reason of Kinder Morgan's additional insured status (a position ACE disputes) the separation of insureds clause requires that the applicability of the professional services exclusion to Kinder Morgan be determined separately. In other words, EIM asserts that Kinder Morgan may rely on the "arising out of your [Comforce's] work" language in the additional insured endorsement to claim status as an additional insured (even if Comforce's work was professional) and then claim coverage for its own nonprofessional role.

    Preliminarily, although ACE disputes that Kinder Morgan was an additional insured, we need not resolve this issue, because even were we to assume that Kinder Morgan was an additional insured, EIM's reliance on the separation of insureds provision does not expand coverage in the instant case. The intent of a separation of insureds provision, also referred to as severability clause, is to " 'provide each insured with separate coverage, as if each were separately insured with a distinct policy, subject to the liability limits of the policy.' " (*Safeco Ins. Co. v. Robert S.* (2001) 26 Cal.4th 758, 772 (*Safeco*).) California case law considering the effect of severability clauses on exclusionary provisions is limited. (See *Safeco, supra,* 26 Cal.4th at pp. 767, 772 (conc. & dis. opn. of Baxter, J.) To the extent such authority exists, no California cases discuss the applicability of a professional services exclusion on an additional insured in a policy with a severability provision. However, a few cases from other jurisdictions have concluded additional insureds were entitled to coverage where the named insureds provided professional services and the additional insureds did not provide any such services.

23

For example, in *Patrick Eng'g., Inc. v. Old Republic Gen. Ins. Co.* (2012 Ill. App.2d) 973 N.E.2d 1036, 1038 (*Patrick Engineering*), a utility company contracted with a consulting firm for engineering design services in connection with the relocation of various utility poles.  Pursuant to the agreement, the consulting firm procured a CGL policy that named the utility company as an additional insured.  (*Ibid.*)  While working on the relocation project, the utility company smashed an underground sewer facility and was sued by the village for negligence.  (*Ibid.*)  The utility company tendered its defense to the consulting firm, which in turn tendered the defense of the litigation to its insurer.  (*Id.* at pp. 1038-1039.)  The insurer denied coverage based on the CGL policy's professional services exclusion.  (*Id.* at p. 1039.)  In the subsequent coverage action, the parties agreed that the CGL policy covered general liability arising out of nonprofessional or labor based services, and not for damage arising out of professional services.  (*Ibid.*)  The parties further agreed that the consulting firm, the named insured, provided only professional services in the form of engineering design (and, therefore, clearly barred from coverage), and that the utility company, the additional insured, provided no professional services.  (*Ibid.*)  The insurer, however, insisted that the policy's professional services exclusion barred coverage for the utility company.  (*Ibid.*)  In response, the consulting firm responded by invoking the policy's separation of insureds clause, which it claimed allowed for the utility company's coverage to be determined independently of the consulting firm.  After reviewing the policy language and noting the limited nature of applicable Illinois case law, the court in *Patrick Engineering* reversed the summary judgment in favor of the insurer.  (*Id.* at pp. 1045-1046.)

The court found support for its conclusion in *United States Fid. & Guar. Co. v. Shorenstein Realty Serv.* (N.D. Ill. 2010) 700 F.Supp.2d 1003, 1007 (*Shorenstein*).  In *Shorenstein*, a realty company hired a consulting engineering firm that, by agreement, obtained its own CGL insurance covering the realty company as an additional insured. The named insured performed professional services in connection with the project and the additional insured did not provide any such services.  (*Ibid.*)  The court held that, pursuant to the separation of insureds clause, the applicability of the professional services

24

exclusion to each insured should be determined separately. (*Id.* at p. 1015.) There, despite the named insured's provision of professional services, the insurer was required to provide the additional insured with coverage because the additional insured did not perform professional services in connection with the project. (*Ibid.*) In so ruling, the court explained that "the question is not whether [the named insured] performed professional services but whether [the additional insured] did so. (*Id.* at p. 1010.)

Here, unlike in *Patrick Engineering* and *Shorenstein*, there is evidence that both the named insured (Comforce) and the additional insured (Kinder Morgan) were tasked with providing professional services in connection with the pipeline. In any event, we agree with the reasoning in *Shorenstein* the relevant question is not whether Comforce engaged in professional services, but whether Kinder Morgan did so. Despite EIM's contentions to the contrary, the record establishes that Kinder Morgan did more than just passively own the pipeline. Rather, Kinder Morgan conceded that it was liable for the explosion because it failed to properly identify the location of the pipeline. Moreover, it is undisputed that Kinder Morgan used its own full-time employee as a line rider, who was responsible for locating and marking the pipeline at the Walnut Creek project site.

To the extent EIM contends that Kinder Morgan did not *actually* perform the professional services, the result is the same. In the underlying litigation, both Kinder Morgan and Comforce are alleged to have failed to locate and mark the pipeline. Further, it is undisputed that Kinder Morgan trained and supervised the inspectors it hired through Comforce. Moreover, it is undisputed that OSHA cited Kinder Morgan for "serious willful" violations of the California Code of Regulations as a result of the failure of its employees to locate and mark the underground pipeline. (See Cal. Code Regs, tit. 8, §§ 1541(b)(1), 1511(b).)

In sum, the basic occurrence that caused the injuries (failure to mark the pipeline) was excluded from coverage by the CGL umbrella policy, and Kinder Morgan cannot obtain coverage by reason of the separation of insureds clause, in that the claims against Kinder Morgan arise from the same facts that preclude coverage vis-à-vis Comforce.

25

**D.      *The Professional Services Exclusion Does Not Render Coverage Illusory***

EIM asserts the trial court failed to narrowly interpret the professional services exclusion and its broad interpretation withdrew so much of the basic coverage that it rendered the policy illusory.  In *Safeco, supra,* 26 Cal.4th 758, cited by EIM, an insurer issued a homeowners policy that expressly covered accidental bodily injury.  (*Id.* at p. 761.)  The insureds were sued in a wrongful death action brought against them after their teenage son accidentally shot and killed his friend.  (*Ibid.*)  The insurer sought declaratory relief that it had no duty to defend its insureds because the policy excluded coverage for an "illegal act."  (*Ibid.*)  The California Supreme Court concluded that coverage was not barred by the "illegal act" exclusion.  (*Id.*at pp. 766-767.)  The policy did not contain a criminal act exclusion and the court would not read one into the policy.  (*Id.* at pp. 763-764.)  The court rejected a construction of the term "illegal" as meaning violation of any law, whether civil, which would include the law governing negligence, or criminal.  (*Id.* at p. 764.)  The policy promised coverage for liability resulting from the insured's negligent acts.  (*Id.* at p. 765.)  "That promise would be rendered illusory if . . . we were to construe the phrase 'illegal act,' as contained in the policy's exclusionary clause, to mean violation of any law, whether criminal or civil."  (*Ibid.*)

Here, in contrast, the ACE policy issued to Comforce did not expressly extend coverage to Comforce for bodily injury caused by its professional services, then completely withdraw coverage through the professional liability exclusion.  The policy was not an errors and omissions policy, insuring against professional malpractice, so that excluding coverage for injuries arising from the rendering or failing to render services of a professional nature would not make the coverage provided illusory.  Rather, Comforce's policy was a business liability policy, which provided coverage for accidental occurrences involving ordinary negligence, not for professional negligence.  (See *Hollingsworth, supra,* 208 Cal.App.3d at p. 808 [even with professional services exclusion, general liability policy affords "coverage for injuries to individuals while on the property"]; *Harad v. Aetna Casualty & Surety Co.* (3d Cir. 1988) 839 F.2d 979, 985 [setting out example that general liability policy would cover circumstance where "an

26

attorney, while hosting a real estate closing in his office, places his briefcase on the floor and a colleague trips on it, is injured and sues him, [as] the lawyer's liability would derive not from the rendering of a professional service, but rather from his operation of a business"].)

In sum, the professional liability exclusion did not withdraw virtually all of the coverage extended by the insuring agreement that defined Comforce's business liability coverage.

## III. DISPOSTION

The judgment is affirmed.[7]  ACE is entitled to its costs on appeal.

---

[7]  By reason of our holding that the professional services exclusion barred coverage for the claims asserted in the underlying lawsuits, we need not address EIM's claims that it was entitled to equitable subrogation, contribution, and indemnity, or ACE's arguments in opposition.

27

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.

Filed 8/10/17

# CALIFORNIA COURT OF APPEAL
## FIRST APPELLATE DISTRICT
## DIVISION FOUR

ENERGY INSURANCE MUTUAL LIMITED,     A140656
  Plaintiff and Appellant,

                                       Contra Costa County
  v.                              Sup. Ct. No. MSC1100600

ACE AMERICAN INSURANCE COMPANY,
  Defendant and Respondent.


BY THE COURT:

The request filed on July 31, 2017 that this court's July 11, 2017 opinion be certified for publication is granted. The Reporter of Decisions is directed to publish said opinion in the Official Reports.


Date:_____    _____P. J.
                                        REARDON, ACTING P. J.

Trial Court:                    Contra Costa County Superior Court


Trial Judge:                    Hon. Judith S. Craddick


Counsel for Appellant:          Baker & McKenzie LLP
                                Ronald L. Ohren
                                Michael A. Pollard
                                Teresa Lauren Michaud


Counsel for Respondents:        Clyde & Co. US LLP
                                William J. Hapiuk
                                Paul R. Koepff
                                Erica J. Kerstein

                                O'Melveny & Myers LLP
                                Jonathan D. Hacker