Filed 5/20/26  In re K.C. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | B349771 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>V.R.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. 24PSJP00035A) |

APPEAL from an order of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Dawyn R. Harrison, County Counsel, and Kim Nemoy, Assistant County Counsel, for Plaintiff and Respondent.

The juvenile court assumed dependency jurisdiction over minor K.C. (Minor) after she was found with V.R. (Mother) and Mother's male companion in a car containing drug paraphernalia. The juvenile court ultimately terminated Mother's parental rights. We consider whether the parental benefit exception should have forestalled that termination.

## I. BACKGROUND

*A. Proceedings Leading to Dependency Jurisdiction*

Minor was born in September 2017. Mother has five older children who are not involved in this case: G.R. (born in 2006), X.R. (born in 2009), J.R. (born in 2010), R.C. (born in 2012), and S.C. (born in 2014). Minor, R.C., and S.C. have the same father, J.C. (Father), who is not a party to this appeal.[1] Mother's parental rights to the two oldest children (G.R. and X.R.) were terminated in 2009, and Minor's other siblings (J.R., R.C., and S.C.) are subject to legal guardianship or have legal guardianship proceedings pending. Siblings R.C. and S.C. are under the guardianship of Minor's paternal aunt and uncle—as we shall discuss, they are also Minor's prospective adoptive parents.

Father reported Mother resided in a sober living home when Minor was born and Minor lived with Father and her paternal grandmother for the first three years of her life. Mother visited Minor "sporadic[ally]" during this period. Minor remained in the care of her paternal grandmother after Father was deported to Mexico. Father subsequently agreed that Mother, who appeared to be "stable," should care for Minor. Father

---

[1] The juvenile court also terminated Father's parental rights.

thought he would continue to have contact with Minor, but Mother "changed her number and cut him off."

Mother previously came to the attention of child welfare authorities in May 2019 when she and her boyfriend were involved in a domestic dispute in a school parking lot. Allegations of emotional abuse were deemed "inconclusive" because Minor and her siblings had "no contact" with Mother. Mother came to the attention of child welfare authorities again in June 2022, when she brought Minor to the emergency room because Minor had ingested a CBD gummy. Mother told a social worker she was homeless and Minor had been staying with her maternal grandmother for a couple weeks, but Minor ingested the gummy when Mother left Minor in a car with her boyfriend "who smokes methamphetamines." A few months later, in October 2022, authorities received a report that Minor was found with Mother's boyfriend in a car that contained "[u]sed needles" and a "meth pipe" while Mother was inside a gas station.

Mother and Minor most recently came to the attention of the Los Angeles County Department of Children and Family Services (the Department) in April 2024, when the Pomona Police Department received a report of a child inside a car with two adults in possession of drug paraphernalia. When a police officer approached the car, Mother left on foot with Minor. Police reported the car was "full of drug paraphernalia" and "it appeared that [Mother's male companion] was about to 'shoot up' . . . ."

A police officer found Mother and Minor about a half mile from the car and called the Department.[2] Mother told officers she

_____

[2]     Social workers had contacted the Pomona Police Department about a week earlier concerning a report that a

3

and Minor had spent the last two nights in the car in which they were initially spotted—a car she thought was abandoned.

A social worker arrived a short time later. She observed Mother "crouched on the floor holding [Minor] with both arms around her . . . ." Mother had bruising around one of her eyes. When police officers asked Mother to stand, Minor "started to stand up" and Mother "pulled [her] back down." Mother told Minor "to keep holding on to her and to hug her." When the officers attempted to lift Mother, she "began yelling and telling [Minor] to keep hugging her and not to let go." When the officers placed Mother in handcuffs, she "continued yelling, directing [Minor] to keep holding on." Mother "had [Minor's] right leg between her legs and [M]other was squeezing trying to hold [Minor], so officers had to pry [M]other's legs apart to release [Minor]." Minor cried and screamed as she witnessed Mother continuing to fight and yell at the officers.

Mother was arrested for misdemeanor child endangerment. (Pen. Code, § 273a, subd. (b).) A criminal protective order barring Mother from contact with Minor (among other things) was issued in April 2024.

The Department filed a two-count petition alleging Minor was at substantial risk of suffering serious physical harm. The petition cited the drug paraphernalia and illicit substances found "within access to [Minor]" and Mother allowing her male companion to have unlimited access to Minor while under the influence of illicit substances.

---

woman matching Mother's description had suffered domestic violence and was abusing drugs in the presence of her children.

The juvenile court ordered Minor placed with her maternal grandparents in April 2024. Minor was moved to the home of her paternal aunt and uncle (guardians for Minor's siblings, R.C. and S.C.) the following June.

The Department was initially unable to reach Mother, but she appeared in juvenile court in early June 2024. Later that month, the juvenile court ordered monitored visitation for Mother pending modification of the criminal protective order. A couple weeks after that, the Department reported Mother had not been in contact with either the Department or Minor. By late July, the juvenile court issued a minute order indicating receipt of a modified criminal protective order and requiring the Department to provide Mother a written visitation schedule. The Department was still unable to reach Mother, and Minor's maternal grandmother told a social worker Mother was in a residential treatment program and subject to a 14-day "bl[a]ck out" period.

### B. Adjudication and Disposition

The juvenile court took dependency jurisdiction over Minor at an adjudication hearing in August 2024. Prior to the disposition hearing the following month, the Department reported Mother had called to request visits but she could not be reached at the number she provided when social workers attempted to follow up and arrange visits.

Mother was present at the disposition hearing, but walked out at one point saying, among other things, she did not "want to hear [any] of this" and insisting she had done "nothing wrong." The juvenile court bypassed reunification services for Mother and ordered monitored visitation.

*C.      Visitation and Placement*

In a status review report filed in March 2025, the Department reported Minor was "comfortable and happy" in the home of her aunt and uncle, who wanted to adopt her. Minor had established a strong bond with her siblings R.C. and S.C., and with her aunt, whom she called "mommy." She was attending school and receiving mental health services.

Minor's aunt also consulted with clinicians about instances of Minor smearing feces on walls and stealing; a therapist reported Minor was "making as much progress as she possibly can for her age." Minor's aunt, social worker, and another clinician agreed it was best not to tell Minor that Mother was permitted to call Minor because Mother "ha[d] not made herself available." Department social workers repeatedly called and sent emails to Mother to arrange for visitation between August 2024 and December 2024, but Mother either hung up or could not be reached.

In a status review report filed in May 2025, the Department reported Minor continued to do well in the care of her aunt and uncle. Minor referred to them as her mom and dad. Minor's aunt was a "big advocate for [Minor's] needs" and was "patient and loving" in her interactions with Minor.

Mother had 16 phone calls with Minor in April and May 2025, but Mother did not "ma[k]e herself available to [the Department] to create an in-person visitation schedule." Minor's aunt, who monitored the phone calls, reported Mother violated various rules—including discussing the dependency proceedings with Minor and exhibiting slurred speech.

Minor did not mention calls with Mother in her (Minor's) weekly meetings with a therapist, but the therapist noted there

6

were "some dysregulations with [Minor's] behaviors" in "mid-April and early May" (around the same time that Mother had increased phone contact with Minor, though Minor's teacher at school was also absent for a period around the same time). Nonetheless, Minor was "acting age appropriate for her circumstances and what she ha[d] been through." In May 2025, Minor was diagnosed with post-traumatic stress disorder and attention deficit/hyperactivity disorder.

In a report filed at the end of September 2025, the Department reported that after repeated, unsuccessful attempts to reach Mother, Mother called a social worker to demand in-person visits in June 2025. Mother indicated it was difficult for her to travel to a halfway point between her location (Pomona) and that of the caregivers (Lucerne Valley) and suggested that the requirement to schedule a social worker to monitor the visits was an unnecessary obstacle. The social worker explained the caregivers were not obligated to drive Minor to Mother's location or to monitor visits.

Mother had one in-person visit with Minor at a McDonald's in Hesperia in early July 2025. Prior to the visit, a social worker and Minor's aunt told Minor that she would be seeing Mother. Minor "smiled and acted excited," and when asked "what she wanted from the visit," she "responded that she wanted the gifts that [Mother] promised her." When the aunt suggested gifts should not be the only thing she wants from Mother, Minor "stated that she misses her." At the beginning of the visit, Mother and Minor hugged and kissed and said they missed each other. Mother was "engaged" and Minor "appeared happy" during the visit; the two played together and watched videos. The social worker monitoring the visit noted Mother repeatedly

asked Minor whose idea it was to cut her hair and who bought her pants. This visit was the only in-person contact (outside of court hearings) Mother had with Minor between April 2024 (when Minor was detained) and October 2025.

Following the in-person visit in early July 2025, Mother missed two phone visits—one because she called early and one because Minor did not feel like talking—and failed to timely confirm the next scheduled in-person visit. On a subsequent call, Mother scolded Minor for learning a dance Mother deemed inappropriate and "started angrily asking [Minor] why she is refusing to talk to her"—apparently a reference to the phone visit that Minor declined. Minor explained "she was in the pool and didn't feel like talking." Mother "got angry" and told Minor "she needs to answer her calls." When Minor attempted to "change the subject of the conversation by asking [M]other to read her a book," Mother "started cussing at someone in the background and was not paying attention," so Minor's aunt ended the call.

Minor's aunt reported that, "on many occasions," Mother would "scold[ ], lie[ ] and question[ ] [Minor's] love for her[,] making their interactions negative." Minor told a social worker she was "half sad and half happy" when Mother missed phone calls.

As of July 2025, Minor said she was "okay with having her relatives adopt her." The following month, though, Minor told social workers she was "'fine'" and felt safe in the care of her paternal aunt and uncle, but she did not want to be adopted because she preferred to live with Mother or her maternal grandmother. However, she "went back and forth mentioning that she wanted to live in the current placement and visit with [M]other and [maternal grandmother]." Minor referred to

Mother by her first name in conversation with a social worker and referred to her aunt and uncle as her mother and father.

### D.    Termination of Parental Rights

The juvenile court held an October 2025 permanency planning hearing to consider termination of parental rights. Mother was not present.  The juvenile court heard argument from counsel on the parental benefit exception, determined the exception did not apply, and terminated parental rights.

In making its ruling, the juvenile court found Mother's single in-person visit and sporadic phone calls were insufficient to meet the first prong of the test articulated in *In re Caden C.* (2021) 11 Cal.5th 614 to determine applicability of the parental benefit exception.  The juvenile court acknowledged it was difficult for Mother to travel for in-person visits but emphasized "17 phone calls in six months is nothing."

As to the second prong of the *Caden C.* test, the juvenile court found Minor would not benefit from a continuing relationship with Mother because although visits had a "probably pretty neutral" impact on Minor, Mother had "not been a mom" to Minor—rather, she was "just that person who calls once in a blue moon to see how [Minor] is."

As to the third prong, the juvenile court concluded terminating Mother's parental rights would not have a detrimental impact on Minor because "she d[id] not have a relationship with [Mother].  Again, [Mother] call[ed] periodically. She ha[d] seen her one time in six months.  [Minor wa]s getting an absolute home with her adoptive parents," with whom she was "happy."

9

The following day, the juvenile court re-called the matter because the court discovered Mother "was in custody in [the] building" at the time of the permanency planning hearing the day prior. The juvenile court explained that although it had already terminated Mother's parental rights, it would "go through the [hearing] again with [Mother] and give her a chance to be heard."

Mother addressed the court and explained that "towards the end of [Minor] being taken, [Mother] did lose a little bit of focus because [she] did not have [Minor]." Mother said she "did . . . classes" and called Minor "[e]very chance [she] g[o]t." During calls, there was "not one second that it[ wa]s quiet on the phone" because Minor would "tell[ ] [Mother] about her day," ask Mother if she had dreams about her, and ask Mother to tell her stories. Mother "made up stories that only [Mother] and [Minor] underst[oo]d."

At this point, counsel for the Department asked that Mother be sworn in to testify, and she was. Mother testified Minor "ran to [her]" at their one in-person visit and Mother was unable to attend additional in-person visits "because there [was] no bus." During phone calls, Mother testified, "there [was] not one moment where [they were] not asking about each other, making sure that [they] saw each other in each other[']s[ ] dreams." Mother claimed her phone was stolen on multiple occasions and she missed calls because "a lot of the time[ ] the caretaker . . . did not answer [her] calls if [she] was a minute late or seconds late." Mother further testified that when Minor declined calls, she subsequently told Mother she didn't know Mother was calling.

The juvenile court again concluded the parental benefit exception did not apply, emphasizing it was "even more sure

10

today than [it] was yesterday" after having heard from Mother. With respect to visitation, the juvenile court remarked that although it was "sure" Minor was affectionate toward Mother on phone calls, "[c]alling her 17 times in six months . . . [was] not sufficient." The juvenile court pointed out Mother had not called Minor during the several weeks preceding the hearing while she was in custody. Mother's argument that the Department was to blame for her lack of visitation was not persuasive. Moreover, Minor did not benefit from occasional visits with Mother. Finally, the court found terminating Mother's parental rights would not negatively impact Minor because she was being well cared for in a home with two of her siblings.

## II. DISCUSSION

Mother did not establish any of the three elements necessary to successfully invoke the parental benefit exception. Her single in-person visit with Minor over the course of the dependency proceedings and sporadic phone calls did not amount to the type of regular visitation needed to prevent termination of parental rights. There is substantial evidence that Minor would not benefit from continuing the relationship with Mother— including Mother's conduct during phone calls, Minor's behavior during periods when she was in regular contact with Mother, and Minor's "half sad and half happy" response to missed calls from Mother. The juvenile court also reasonably determined that terminating Mother's relationship with Minor would not be detrimental to Minor in light of the stability and other benefits afforded by her prospective adoptive home.

11

## A.    *Legal Framework*

If a juvenile court finds by clear and convincing evidence at a Welfare and Institutions Code section 366.26 hearing that a child is likely to be adopted, "the court shall terminate parental rights and order the child placed for adoption" unless, as relevant here, it "finds a compelling reason for determining that termination would be detrimental to the child due to one or more" enumerated exceptions.[3]  (§ 366.26, subds. (c)(1) & (c)(1)(B); see also *Caden C.*, *supra*, 11 Cal.5th at 630-631.)  "The statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

The exception at issue here, the parental benefit exception, applies if "termination would be detrimental to the child" because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  A parent invoking the exception in an effort to forestall termination of parental rights bears the burden to demonstrate three things by a preponderance of the evidence.  First, the parent must show he or she had "regular visitation and contact with the child, taking into account the extent of visitation permitted."  (*Caden C.*, *supra*, 11 Cal.5th at 636.)  Second, the parent must show "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship."  (*Ibid.*)  This element is affected by "'[t]he age of the child, the portion of the child's life spent in the

---

[3]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

12

parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Id.* at 632 [in conducting this assessment, "courts often consider how children feel about, interact with, look to, or talk about their parents"].)  Third, the parent must show that "terminating that [parental] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Id.* at 636.)

Our review of the juvenile court's ruling on the parental benefit exception is for substantial evidence on the first two of these elements and for abuse of discretion on the third. (*Caden C., supra,* 11 Cal.5th at 639-640.)

### B.     Analysis
#### 1.     *Substantial evidence supports the juvenile court's finding that Mother did not establish regular visitation*

Mother does not dispute the juvenile court's finding that she had one in-person visit and 17 phone calls with Minor between April 2024 and October 2025.  Mother contends, however, that she "visited to the extent that was permitted" and cites various obstacles to her maintaining regular contact with Minor.  These include the criminal protective order that was in place until July 2024, her difficulty reaching the Department, her inconsistent access to a phone and transportation, and Minor's aunt's strictness regarding scheduled call times.

Mother's arguments address only some of the gaps in her contact with Minor and, taken together, do not demonstrate a lack of substantial evidence for the juvenile court's finding that this element was not satisfied.  The protective order was only an

13

impediment to visitation for the first few months of the dependency proceedings, and the Department reported it reached out to Mother to schedule visits after it was modified. Mother's transportation difficulties did not explain the lack of consistent phone calls.[4] Mother's contention that the caregiver was uncooperative in facilitating phone calls with Minor rests on some unsupported assertions (e.g., that a five-minute grace period meant the caregiver was required to answer calls *before* the scheduled time), but even assuming Mother's claims are well-founded, they still do not explain more than a handful of her many missed calls. (*Caden C.*, *supra*, 11 Cal.5th at 640 [on substantial evidence review, the juvenile court's "determinations should 'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence'"].)

> 2. *Substantial evidence supports the juvenile court's determination that Minor would not benefit from continuing the relationship*

Substantial evidence also supports the juvenile court's determination that Minor would not benefit from continuing the relationship. The affection that Mother and Minor had toward one another, which the juvenile court acknowledged, is not dispositive as to this element. (*In re Katherine J.* (2022) 75

---

[4] Mother was able to contact the Department at times when she had no calls with Minor and, as the juvenile court emphasized, she did not attempt to call Minor when she was in jail.

14

Cal.App.5th 303, 318 ["the beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].)  Although Mother accords great emotional weight to her discussions of dreams and private stories with Minor, our inquiry is focused on the child (*Caden C.*, *supra*, 11 Cal.5th at 632), and contact with Mother appeared to have a negative impact on Minor.  A therapist who worked with Minor observed "some dysregulations with [Minor's] behaviors" when Mother was calling consistently in April and May 2025.  Mother also violated various rules established to protect Minor during phone calls—including discussing the case and having slurred speech—and interrogated or scolded Minor on occasion.  Minor also expressed partial relief when Mother failed to call.

> ### 3.   *The trial did not abuse its discretion in determining that terminating Mother's parental rights would not be detrimental to Minor*

The third element of the parental benefit exception requires courts to consider "whether it would be harmful to the child to sever the relationship and choose adoption.  (§ 366.26, subd. (c)(1)(B); see also *id.*, subd. (c)(1)(D).)  Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. [Citations.]  What courts need to determine, therefore, is how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life.  [Citation.]" (*Caden C.*, *supra*, 11 Cal.5th at 633.)  In other words, the juvenile court

15

"decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.]" (*Ibid.*)

Here, Minor had spent more than a year in the care of her prospective adoptive parents: her aunt and uncle who also served as the legal guardians for two of her siblings. Minor appeared happy and comfortable, and she referred to her aunt and uncle as mom and dad—in significant contrast to occasional references to Mother by her first name. Minor's aunt, in particular, was a "big advocate for [Minor's] needs" and took an active role in Minor's mental health services. There is nothing in the record to indicate Minor suffered any detriment as a result of the extended periods in this case during which Mother failed to call or visit. To the contrary, there was a correlation between behavioral issues and the resumption of contact with Mother.

Mother, however, emphasizes Minor's statements indicating she did not want to be adopted.[5] That does not take full account of the record before us. The record shows Minor equivocated on the question of adoption: sometimes saying she was "okay" with adoption and sometimes saying she wanted to live with Mother or maternal grandmother. That sort of equivocation does not warrant setting aside the juvenile court's balancing of benefits and harms.

Mother also suggests the juvenile court should have selected legal guardianship as the permanent plan for Minor

---

[5] Minor was eight years old on the date of the section 366.26 hearing, so the statutory exception to termination of parental rights where "[a] child 12 years of age or older objects to termination of parental rights" does not apply. (§ 366.26, subd. (c)(1)(B)(ii).)

16

because this was her siblings' situation and "no evidence showed paternal aunt and uncle would want [Minor] replaced if they were her legal guardians" as opposed to her adoptive parents.[6] But this is not a relevant consideration in applying the parental benefit exception. "'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1),'" including the parental benefit exception. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225.) Put more succinctly, the potential availability of an alternative permanent plan is not itself grounds for a detriment finding and a departure from the Legislative preference for adoption.

---

[6]     Mother's argument disregards an October 2025 Department report that indicates Minor's aunt and uncle were not interested in legal guardianship.

DISPOSITION
The juvenile court's order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:



HOFFSTADT, P. J.



MOOR, J.